IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

STEVE HINDI and GREG CAMPBELL )
And SHARK (SHOWING ANIMALS )
RESPECT AND KINDNESS), formerly )
known as CHARC (CHICAGO )
ANIMAL RIGHTS COALITION) )
)
             Plaintiffs, )
)
   v. )
)
THOMAS GOOCH III, ALBERT )
WYSOCKI, JOHN VAN DIEN, )
GARY DEL RE, The Sheriff of )
Lake County, MICHAEL WALLER, )
States Attorney Of Lake County, )
The VILLAGE OF WAUCONDA, a )
municipal corporation, and DANIEL )
QUICK, The Chief of Police of The )
Village of Wauconda )
)
            Defendants. )



CASE No.

JUDGE JOHN W DARRAH

MAGISTRATE JUDGE SCHENKIER

TRIAL BY JURY DEMANDED

**COMPLAINT**

DOCKETED

APR 2 4 2002

The plaintiffs, through their attorney, RICK HALPRIN, complains of the defendants as follows, with all Counts pled both cumulatively and in the alternative:

**JURISDICTION**

1. The jurisdiction of the Court is invoked pursuant to the *Civil Rights Act 42, U.S.C. §§ 1981, 1983*, and *1988*, the *Judicial Code 28 U.S.C. §§ 1331, 1343(a), 1367(a)* and *2201* and this Court has pendent jurisdiction over related state claims. Jurisdiction is also invoked under the *First* and *Fourteenth Amendments* to the *United States Constitution*.

1

2.  In addition to the above this cause seeks relief for pendent State claims.  The Court has pendent jurisdiction under United Mine Workers of America v. Gibbs, 383 U.S. 715, 88 S.Ct. 1130, 16 L.Ed.2d 218 (1996), and other applicable law.

## VENUE

3.  At all relevant times, the individual defendants have resided and worked within the boundaries of the Northern District of Illinois, Eastern Division, and the corporate defendants have maintained both their registered agent and a place of business within those boundaries.

4.  In addition, all of the conduct complained of in this cause occurred within the boundaries of the Northern District of Illinois, Eastern Division.

5.  For the above reasons venue in this Court is proper pursuant to *28 U.S.C. § 1391(a)*.

## PARTIES

## PLAINTIFFS

6.  Plaintiff **Steve Hindi** (hereinafter "**Hindi**") is a citizen of the United States and the State of Illinois.

7.  Plaintiff **Greg Campbell** (hereinafter "**Campbell**") is a citizen of the United States and a resident of the State of North Carolina.

8.  Plaintiff **Chicago Animal Rights Coalition** (hereinafter "**CHARC**") is a voluntary association of persons advocating the humane treatment of animals. All named plaintiffs are members of **CHARC**.[1]

---

[1] Now known as **SHARK - SHOWING ANIMALS RESPECT AND KINDNESS,** all references in this complaint are to its predecessor **CHARC.**

## DEFENDANTS

9. Defendant Attorney **Thomas Gooch III** (hereinafter "**Gooch**"), was at all times relevant to this complaint the attorney for co-defendant **John Van Dien**, whose principle law offices are located in Wauconda, Illinois. **Gooch** at all times relevant in this lawsuit was acting in concert with at least two Lake County public officials: co-defendants, **Michael Waller**, State's Attorney of Lake County and **Gary Del Re**, the Sheriff of Lake County. He is sued in his individual capacity.

10. Defendant Attorney **Albert Wysocki** (hereinafter "**Wysocki**") was at all times relevant to this lawsuit an attorney and the partner of co-defendant **Gooch**. Additionally **Wysocki** is a former Lake County Deputy Sheriff and a former Lake County Associate Judge. At all times relevant to this lawsuit **Wysocki** was the attorney for **Van Dien** and was acting in concert with at least two Lake County public officials: co-defendants, **Michael Waller**, State's Attorney of Lake County and **Gary Del Re**, the Sheriff of Lake County. He is sued in his individual capacity.

11. Defendant Deputy Sheriff **John Van Dien** (hereinafter "**Van Dien**") was and is at all times relevant a Deputy Sheriff of Lake County, who in a private capacity filed a false lawsuit against plaintiffs in retaliation for their legitimate exercise of their *First Amendment rights*. **Van Dien** was acting in concert with co-defendants **Waller** and **Del Re**. **Van Dien** is sued in his individual capacity.

12. Defendant **Gary Del Re** (hereinafter "**Del Re**") was at relevant times, the Sheriff of Lake County. He is sued in his official capacity.

13. Defendant **Michael Waller** (hereinafter "**Waller**") is and was, at all relevant times, the State's Attorney Of Lake County. At all times relevant to this lawsuit **Waller** was acting under the color of state law. He is sued in his official capacity.

14. Defendant **Village of Wauconda** (hereinafter "**Wauconda**") is a municipal corporation duly incorporated under the laws of the State of Illinois, and as such is responsible for the ordinances it enacts and the policies it promulgates.

15. Defendant **Daniel Quick** (hereinafter "**Quick**") is and was at all times relevant to this complaint the Chief of Police of the **Village of Wauconda**. **Quick** is also the current President of the **Wauconda Chamber of Commerce**. **Quick** is the chief policy maker for the Wauconda Police Department. He is sued here in his official capacity.

## INTRODUCTION

16. In this action plaintiffs seek damages and declaratory and injunctive relief against the named defendants for their unlawful interference with the plaintiffs' *First Amendment rights*. At the core of this action is the annual **Wauconda Chamber of Commerce** (hereinafter "**WCC**") Rodeo. Since at least 1993 this event has been the catalyst for putting the respective rights, duties, powers, and obligations of the plaintiffs and defendants on a yearly collision course. Again from at least 1993, the **WCC** has exercised its power in an effort to inhibit, frustrate, and eliminate the yearly protests conducted by plaintiffs at the Rodeo. The primary source of the **WCC's** power is its

ability to deliver votes and campaign contributions to local elected Lake County officials.

The political "clout" of the **WCC** is so pervasive in Lake County that it has caused the

Lake County's State's Attorney Office, Sheriff's Office, and at least in one particular

case an Associate Judge of the Lake County Judicial Circuit Court to corruptly perform

their legal duties whenever the interest of **WCC** and/or their own political interest are

either directly or indirectly involved. **This action is predicated on the filing of a libel**

**suit against plaintiffs by defendant Van Dien.** The suit <u>John Van Dien v. Steve Hindi,</u>

<u>Greg Campbell, and the Chicago Animal Rights Coalition;</u> 97 L 371, 19th Judicial

Circuit Lake County, Illinois. [2]

    17. **The suit executed under oath by Van Dien was filed in bad faith and**

**contains a number of false allegations, which were known to be false by Van Dien**

**and his lawyers Gooch and Wysocki. Gooch, Wysocki, and Van Dien filed this suit**

**in concert with two public officials, Waller and Del Re. The suit was a part of a**

**conspiratorial plan and done in concert with Waller, Del Re, and others. The**

**objective of this suit was to retaliate against plaintiffs for the exercise of their *First***

***Amendment rights* and to eliminate their ability to effectively protest future**

**Wauconda Rodeos.**[3] (The suit and its relationship to the overall conspiracy are detailed

in paragraphs 61-90 of this complaint).

---

[2] This action was first filed on **May 14, 1997**, voluntarily dismissed on **September 20, 2000**, refiled on **September 26, 2000** case no. 00L758, and voluntarily dismissed **February 14, 2002.**

[3] Paragraphs 19 & 20 of **Van Dien's** suit read:

    19. That the document a attached hereto as Exhibit "A" has directly impacted your plaintiff's reputation amongst the general public, the press and media, his family and friends and other members of the law enforcement community, exposing your plaintiff to great embarrassment, ridicule, scandal and disgrace all to the damage of your plaintiff in an amount in excess of **$100,000.00.** (Emphasis added).

    20. That as aforesaid, malice is the gist of this action. Furthermore the document attached hereto as Exhibit "A" was disseminated to the general public immediately before other members of the **CHICAGO ANIMAL RIGHTS COALITION** were about to be placed on trial after being arrested by sheriff deputies at the aforesaid rodeo in 1996; said dissemination being nothing more than an attempt to

## FACTS COMMON TO ALL COUNTS

18. The **WCC** has presented the annual Wauconda Rodeo (hereinafter "Rodeo")
for many years. The purpose of presenting the Rodeo is, in part, to promote local
business interests in return for the sponsorship of the Rodeo by local businesses. The
**WCC** charges admission to the Rodeo as a public event. **Wauconda** supports and
promotes the Rodeo. (A former president of the **WCC** described the Rodeo "inexorably
linked to **Wauconda's** identity.")

19. In recent years the Rodeo has been held on a property site commonly known
as the Golden Oaks Farms. The Farm is adjacent to two public ways: Case Road and
Route 12.

20. In 1993, persons organized as the North West Animal League and **CHARC**
protested the maltreatment of circus and rodeo animals and the Rodeo's alleged violation
of the *Humane Care of Animals Act (510 ILCS, 70/1, formerly Ill.Rev.Stat., Ch. 8, par.
701).*

21. In 1994, some of the plaintiffs, members of **CHARC**, undertook various
activities to protest the Rodeo including the picketing of various **Wauconda** businesses,
which sponsor the Rodeo.

22. On or about June 21, 1994, in reaction to the protests of the plaintiffs, the

---

assassinate the integrity of the Lake County Sheriff's office and curry public favor and opinion
immediately before a trial. Furthermore, the aforesaid document has been published and disseminated as a
part of a massive public relations campaign begun by defendants prior to the 1997 Wauconda rodeo.
Consequently, Plaintiff is entitled to an award of **exemplary damages in an amount of at least
$100,000.00.** (Emphasis added).

    Wherefore, your plaintiff **JOHN VAN DIEN** prays this honorable court enter judgment in the
amount of **compensatory damages of $100,000.00 plus $100,000.00 in exemplary damages or in such
greater sum as a jury shall determine** against Defendants **Steve Hindi** and **Greg Campbell**, both
individually and doing business as The **CHICAGO ANIMAL RIGHTS COALITION**, plus cost of suit.
(Emphasis added).

    Complaints are Exhibit "1" and "1(a)"here.

Wauconda Village Board enacted an ordinance number *1994-0-32* entitled *"Parades and Assemblies on Public Property" (Chapter 7)*.

23. This ordinance was passed with the specific intent of suppressing plaintiffs' *First Amendment rights* to continue their protests of cruelty to animals in **Wauconda**.

24. The **WCC** contracted with the Lake County Sheriff's Office to provide deputy sheriffs as privately paid "security forces" for the Rodeo. The **WCC**, through its officers, directors, and/or spokespersons at the Rodeos in 1994, 1995, 1996 and 1997, (specifically through Roseanne Hansen in 1995 and 1996) directed the activities of the deputies. {That is to say, **Captain Frank Winans** (hereinafter **"Winans"**) ordered his deputies to falsely arrest plaintiffs pursuant to his agreement with **Hansen**.}

25. In 1995, in contravention of the plaintiffs' *First Amendment rights*, and by agreement with and under the direction of the **WCC**, the deputy sheriffs imposed prior restraint upon the plaintiffs' exercise of the *First Amendment* rights by unlawfully restricting their demonstration to an area selected by the **WCC**, which provided no access to the Rodeo audience.

26. In 1995, the deputies unlawfully ordered the protesters to keep moving, denying them the right to stand in the public way and make their protest.

27. In 1995, the deputies unlawfully demanded the abandonment of the protesters' banners.

28. In 1995, the deputies unlawfully prohibited the protesters from displaying their signs within arbitrarily designated distances from public roads.

29. In 1995, the deputies unlawfully prohibited the plaintiffs from videotaping the protest and the actions of the officers at the protest, and threatened them to turn off

their cameras or they would be seized.

30. In 1995, the deputies, without probable cause to do so, threatened to charge the protesters with various criminal charges including mob action, conspiracy, and violations of eavesdropping law, if any of these arbitrary orders were not followed, in an effort to inhibit plaintiffs' exercise of their *First Amendment rights*.

31. Prior to the 1995 Rodeo, **Del Re** publicly stated that the use of megaphones for protest was legal. Nevertheless, during the Rodeo **Winans** told the plaintiffs that because some of the Rodeo sponsors and participants objected to the plaintiffs' amplified messages, the continued use of the megaphones would be deemed to be disorderly conduct and would result in their arrests.

32. In 1995, officers Oliver and Crilly along with defendant **Van Dien** arrested plaintiffs **Campbell** and **Hindi** without probable cause, falsely charging them with disorderly conduct for their use of megaphones in their protest. As a result of **CHARC's** yearly protests at the Rodeo the leaders of the **WCC**, **Van Dien**, and **Winans** were aware that **Hindi**, **Campbell** and **Terri Campbell** were the leaders of **CHARC**.

33. Those charges were dismissed by the Lake County State's Attorney's Office.

34. On July 13, 1996 **Winans**, then a Captain of the Lake County Sheriff's Department and **Van Dien** were part of a security detail for the annual Rodeo. The Lake County Sheriff's office had an agreement with the **WCC** whereby the **WCC** would pay the salary of the sheriff's deputies that were assigned to security at the Rodeo. Historically the security detail included 8 to 10 deputies who were specifically assigned to monitor at all times the protestors. Sometime on July 13, 1996, **Winans** and **Van Dien** noticed three paragliders and one hot-air balloon flying in the vicinity of the Rodeo. In

**Winans** and **Van Dien's** minds the paragliders and hot-air balloon were in some way associated with the protestors.

35. **Winans** and **Van Dien** both knew **Campbell** and his wife **Terri** from previous Rodeo encounters. Both **Winans** and **Van Dien** also knew that **Terri Campbell** was suffering from advanced Multiple Sclerosis and knew she required a cane for walking and required to sit frequently as a result of this disability.

36. Eventually, **Van Dien** and **Winans** approached **Campbell** who was surrounded by a small group of protestors. While all this was occurring another member of **CHARC, Sue Piszczek** (hereinafter **"Piszczek"**) was operating a handheld video camera. An independent news cameraman and reporter were also videotaping the interaction.

37. Winans approached **Campbell** and ordered **Campbell** to use **Campbell's** handheld radio to order the gliders out of the Rodeo area. **Winans** told **Campbell** that if he did not comply he would be charged with mob action. **Campbell** truthfully responded that the radio battery was dead. **Winans** attempted to grab the radio from **Campbell** who threw it over his shoulders into the air. Immediately after that the following events quickly occurred.

    A. **Van Dien** who at the time was approximately 6'4" and weighed well over 250lbs charged towards the protestors.

    B. **Terri Campbell** and another protestor were standing in the area near where the radio landed. As they both walked to pick up the radio the charging **Van Dien** flattened **Terri Campbell** to the ground.

C.  The radio flew in the direction of **Christine Grushas** (hereinafter "**Grushas**").

D.  **Van Dien** continued his charge, thereafter tackling **Grushas** to the ground and knocking the radio to the ground as well.

E.  In the interim **Winans** "slipped and fell"; ordered **Campbell's** arrest and went to the area near **Grushas** and retrieved the radio.

F.  At or about the same time **Piszczek** yelled at **Winans** and **Van Dien** "It's all on film **Winans**."

G.  **Winans** then ordered **Van Dien** to arrest **Grushas**.

H.  With **Grushas** in tow, **Van Dien** confronted **Piszczek**. **Piszczek** suffers from Spina Bifida and weighed 90lbs. **Van Dien** grabbed **Piszczek** who fell to the ground and forcibly twisted her camera from her hand, and tucked the camera under his arm. **Piszczek** was not arrested.

I.  **Van Dien** then hid the camera under **Grushas'** backpack concealing it from casual view and escorted **Grushas** to the area in the Rodeo where the deputies maintained a padywagon for "detention." After bringing **Grushas** to the detention site **Van Dien** then took **Piszczek's** video camera and removed the tape from the camera and confiscated it pursuant to instructions from **Winans**. Both of whom believed that **Piszczek** captured on tape **Van Dien's** knocking **Terri Campbell** to the ground.

J.  Thereafter, **Van Dien** on instructions from **Winans** filed false official police reports indicating that he had found the camera lying on the grass at the site.

37. **Van Dien's** report of January 13, 1996 reads in part:

> Two (2) video camera recorders were confiscated, one belonging to Offender #1 and the other was found lying in the grassy area. One (1) Motorola portable 2 way radio and an 8 mm video tape was also taken from Campbell. These items were placed into evidence.

38. **Piszczek's** camera was then inventoried without the tape.

39. On July 12, 1996 at the direction of Hansen and under the orders of **Winans**, Blackwood, McGarvie and **Van Dien** arrested **Campbell** and **Hindi** as well as **CHARC** members **Kelly Mazeski, Michael Durschmid, Kimberly Froelke, Danny Green,** and **Amy Green** charging each of them with disorderly conduct for their use of megaphones in protest.

40. The Office of the State's Attorney dismissed all charges against all plaintiffs.

41. Following the dismissal of the July 12, 1996 disorderly conduct charges against plaintiffs **Campbell** and **Hindi**, as well as **CHARC** members **Michael Durschmid, Danny Green, Amy Green, Kim Froelke** and **Kelly Mazeski** by the Office of the States Attorney of Lake County, various **CHARC** members made public statements of intent to bring public suit to secure their rights under the *First Amendment* in the future. Thereafter, the State's Attorney and **Waller** reinstated the disorderly conduct charges and without probable cause added the charges of **conspiracy to commit disorderly conduct** against these plaintiffs and **CHARC** members.

## COUNT I

## CONSPIRACY TO RETALIATE AGAINST PLAINTIFF AND OTHERS FOR THE EXERCISE OF THEIR FIRST AMENDMENT RIGHTS

### MEMBERS OF THE CONSPIRACY

42. Defendant **Thomas Gooch III**.

43. Defendant **Albert Wysocki**.

44. Defendant **John Van Dien**.

45. Defendant **Gary Del Re**.

46. Defendant **Michael Waller**.

47. Non-Defendant Assistant States Attorney for Lake County **Daniel Shanes** (hereinafter "**Shanes**").

48. Non-Defendant Associate Judge for the 19th Judicial Circuit of Lake County **John T. Phillips** (hereinafter "**Judge Phillips**").

49. Non-Defendant **Frank Winans**.

50. Non-Defendant **Wauconda Chamber of Commerce**[4], the chamber acts through its officers, members, directors, agents and employees.

51. Others unknown to the plaintiffs at this time.

### THE AGREEMENT TO COMMIT UNLAWFUL ACTS OR TO PERFORM LAWFUL ACTS IN AN UNLAWFUL MANNER

52. Sometime prior to February 10, 1997 **Waller** and **Del Re** agreed to perform a series of acts which were either illegal or which were legal in an unlawful manner in order to accomplish initially two objectives. First, to cover up the criminal acts committed by **Winans** and **Van Dien** on July 13, 1996 and secondly to destroy or at least

---

[4] No relief is sought against non-defendants: **Shanes, Judge Phillips, Winans,** and the **WCC**.

substantially compromise **CHARC's** ability to protest the annual Rodeo and to document animal abuse. It was an essential part of this plan that **Waller** and **Del Re** would target the leaders of **CHARC** whom they correctly believed to be **Hindi**, **Campbell** and **Campbell's** wife **Terri**.

53. In general **Waller** and **Del Re** agreed that they would secure the criminal convictions of **Hindi** and **Campbell** as well as the convictions of a number of other protestors who were charged with disorderly conduct. To implement this plan in part **Waller**, **Del Re**, **Winans**, and **Van Dien** agreed that **Van Dien** and **Winans** would testify falsely at the forthcoming criminal trials. **Waller** and **Del Re** also agreed to cover up **Van Dien's** illegal seizure of **Piszczek's** camera, subsequent destruction of the tape from the camera, and **Van Dien's** filing of false police reports.

54. This aspect of the plan would directly benefit their own political interests. **Waller** and **Del Re** devised a second scheme, which would confer a direct benefit on the **WCC**. This part of the scheme was directed to achieve **"NO CONTACT ORDERS"** against the convicted defendants (plaintiffs here). Such an order in fact is an injunction issued by a court prohibiting a convicted defendant from contact with the "victim." (No Contact Orders, Injunctions, were available for convictions of trivial misdemeanors such as disorderly conduct under Illinois law.) However, the plan was not without problems. No Contact Orders (Injunctions) entered against persons who were convicted while in the exercise of their *First Amendment rights* which would inhibit or limit future exercise of that *right* were severely restricted by decisions of the U.S. Supreme Court and other high courts of review. **Waller** and **Del Re** knew that their offices had the power to influence certain Judges in Lake County to compromise or corruptly perform their duties. **Waller**

and **Del Re** knew that this power would be enhanced where the intended beneficiary of "judicial malfeasance" was the **WCC**. The conspiratorial agreements and implementation through overt acts occurred between July 13, 1996 and the present. The conspiracy is divided into phases in which the various agreements were made and executed in order to meet the short term problems and long range goals of the overall conspiracy.

## ASSISTANT STATE'S ATTORNEY DANIEL SHANES AND ASSOCIATE JUDGE JOHN T. PHILLIPS

55. In order to implement this plan, **Waller** recruited directly or indirectly an ambitious and thoroughly dishonest Assistant State's Attorney **Daniel Shanes**. **Waller** knew **Shanes** would do anything to advance his career and fulfill his "ultimate ambition" to be a Lake County Judge. **Waller** and **Del Re** also knew that the Judge most likely to hear the bulk of the 1996-protestor cases, which they anticipated would be jury trials, was **Judge Phillips**. **Waller** and **Del Re** both knew and agreed that **Judge Phillips** was a Judge who could be corrupted by the combined influences of their offices and the **WCC**.

56. **Waller** and **Del Re's** assessments of **Shanes** and **Judge Phillips** proved to be unerringly correct. The conspirators' agreement had only one glitch. Lake County **Associate Judge Patrick N. Lawler** (hereinafter "**Judge Lawler**"), an honest and incorruptible Judge was also available to hear protestors cases if they were to be tried by bench.[5]

---

[5] In PEOPLE OF THE STATE OF ILLINOIS v. STEVE HINDI; GREGORY CAMPBELL; TERRI CAMPBELL; KIMBERLY FROELKE; AMY GREEN; DANNY GREEN; KELLY MAZESKI, 96 CM 4770; 96 F 1913; 96 CM 4775; 96 CM 4774; 96 CM 4773; 96 CM 4772; 96 CM 5178, these defendants were tried jointly in a bench trial before **Judge Lawler**. Although, **Judge Lawler** found most of them guilty for disorderly conduct (defendants use of megaphones to protest at the 1996 Wauconda Rodeo) **Judge Lawler denied Shanes' motion to enter No Contact Orders.**

**OVERT ACTS**

**PHASE ONE**

57. **Grushas'** trial (People v. Grushas; 96 CF 1912, 19th Judicial Circuit, Lake County) was set for February 10, 1997. Sometime prior to February 10, 1997 **Shanes** was provided videotapes made by the protestors and the independent news crew depicting the events of July 13, 1996.

58. Prior to this, sometime in September 1996, **Waller** and **Del Re** were personally made aware of the tapes, which depicted events of July 13, 1996. Included in these tapes were **Van Dien** seizing **Piszczek's** camera and confiscating its tape.

59. **Shanes, Waller,** and **Del Re** knew **Van Dien** hid the camera and confiscated **Piszczeck's** tape because **Van Dien** and **Winans** believed **Piszczek** captured **Van Dien** knocking **Terri Campbell** to the ground. **Waller** instructed **Shanes** either directly or indirectly to cover-up **Van Dien's** false police reports. **Shanes** agreed with **Van Dien** that he, **Van Dien,** should testify falsely at trial to cover-up his criminal acts, which **Van Dien** did.

60. **Grushas** was tried before bench alone. Presiding over the trial was **Judge Lawler.** Despite the efforts of **Van Dien** and **Shanes, Judge Lawler** acquitted **Grushas** after his review of the videotape provided by the defendant which depicted **Van Dien's** take down of **Grushas.** As a result, the **WCC** was very unhappy.

## PHASE TWO
## STEVE HINDI GOES PUBLIC WITH THE TAPES

61.  The conspirators' problems became more acute when on May 5, 1997 **Hindi**
appeared in front of the Lake County Sheriff's Office equipped with the videotape and a
monitor showing **Van Dien** seizing **Piszczek's** camera and confiscating the tape.  In
addition, **Hindi** also distributed a leaflet inviting persons to view the video.

62.  The videotape in **Hindi's** possession depicted the same events, which
persuaded **Judge Lawler** to acquit **Grushas.**[6]  In addition, **Hindi** was distributing leaflets
(Exhibit "2"), which read:

### WHEN WILL LAKE COUNTY INVESTIGATE
### BRUTAL SHERIFF'S DEPUTY?

One evening last July, a man brutalized and assaulted three women outside
Wauconda.  This is, of course, a horrendous and disgusting crime.  But the
worst part about it is that the assailant was a <u>Lake County Sheriff's
Deputy!</u>

The assailant, Deputy John Van Dien, weighs almost <u>three hundred
pounds.</u>  None of his victims weigh more than 130 pounds.  <u>One of them
weighs ninety pounds.</u>  Van Dien actually arrested one of the women, in
an attempt to cover up his crime.  She went to court, and was found <u>not
guilty!</u>

Fortunately, Deputy Van Dien was **videotaped** (emphasis added)
assaulting two of the women.  You would think that this would make the
punishment of this unfit police officer easy.  Regrettably, <u>this has not been
the case.</u>

Ever since the assaults, citizens have been trying to get Sheriff Gary Del
Re or State's Attorney Michael Waller to investigate.  Both have
steadfastly refused.  Why?

---

[6] Also depicted on the same date was **Van Dien's** illegal seizing of **Piszczek's** camera and confiscation of
the tape.

See what you think!  Just ask a protestor, and you can see the assaults on video for yourself - right here - right now!  <u>You should see it, because we don't need bad police officers.</u>  **The next victim might be your wife, your daughter, your mother, <u>or even you!</u>**

**PHASE THREE**
**<u>WALLER AND DEL RE RESPOND</u>**
**<u>GOOCH AND WYSOCKI ARE RECRUITED AND JOIN THE CONSPIRACY</u>**

63.  **Hindi's** action of May 5, 1997 was well publicized.  In response **Waller** falsely stated in an interview to a reporter that they "found no wrong doing on **Van Dien's** part."

64.  **Waller** said that his office had reviewed the tapes and falsely reported that they found no wrong doing on **Van Dien's** part.  This statement was given and subsequently published in the *Daily Herald*.  On the same day **Del Re** falsely stated to a reporter from the *Waukegan Daily News Sun* that on the basis of his, **Del Re's**, and **Waller's** investigation and review of the videotapes there was "no basis to investigate." On May 6, 1997 **Del Re** falsely reported to the *Chicago Tribune* that he found "no basis for investigating misconduct."

65.  **Waller** and **Del Re** either directly or indirectly recruited **Gooch** and **Wysocki.**  **Gooch** and **Wysocki** were informed that they would receive the full support from **Waller** and **Del Re** in filing a suit against plaintiffs for libel.  The attorneys were assured either directly or indirectly by **Waller** and **Del Re** that in filing such a suit they could rely on **Waller** and **Del Re's** false assertions concerning "their investigation" into **Van Dien's** conduct on July 13, 1996 and their "findings" of no misconduct.

## PHASE FOUR
## THE VAN DIEN CIVIL SUIT

66. May 14, 1997, pursuant to their agreement with **Waller** and **Del Re**, **Gooch**
and **Wysocki** filed a suit in the Lake County Circuit Court (<u>JOHN VAN DIEN v. STEVE
HINDI and GREG CAMPBELL, individually and d/b/a CHICAGO ANIMAL RIGHTS
COALITION; 97 L 371</u>), which was executed by **Van Dien** under oath. The suit in part
falsely states:

> 8. That at all times in making the aforesaid arrests your plaintiff
> and other law enforcement officers were following standard and
> acceptable police procedures in carrying out their official duties.
> 9. That at some time after the aforesaid arrests the defendants and
> other presently unknown persons accused your plaintiff and other sheriff's
> deputies of gross police misconduct in the performance of their official
> duties as set forth above and demanded a full investigation by the then
> Sheriff of lake County, Clinton Grinnell and by the State's Attorney's
> office of Lake County.
> 10. That a complete investigation was conducted by the Sheriff of
> Lake County and reviewed by the States Attorney's office of Lake
> County. All allegations of any type of police misconduct were found to be
> unsubstantiated and unbound. Further allegations of criminal conduct
> brought by the defendants against your plaintiff and others were
> determined to be unfounded
> 11. That on one or more occasions prior to May 5, 1997, both the
> Sheriff of Lake County and the State's Attorney of Lake County, through
> their respective offices, and staff met with the defendants and others as yet
> unknown and unnamed persons and reviewed with them the results and
> conclusions of the aforesaid investigation
> 12. That knowing that the plaintiff was not guilty of any crime or
> official police misconduct the defendants Steve Hindi and Greg Campbell
> together with other as yet unknown persons, individually and on behalf of
> The CHICAGO ANIMAL RIGHTS COALITION created a published a
> document captioned "WHEN WILL LAKE COUNTY INVESTIGATE
> BRUTAL SHERIFF'S DEPUTY?". A complete copy of the aforesaid
> document is attached hereto as Exhibit "A".
> 13. That on May 5, 1997 and thereafter, defendants Steve Hindi,
> Greg Campbell and other as yet unnamed and unidentified persons
> individually and on behalf of The CHICAGO ANIMAL RIGHTS

18

COALITION disseminated this document, set forth as Exhibit "A" attached hereto, to members of the general public by passing them out in front of the Lake County Sheriff's Office Building in Waukegan, Lake County, Illinois.

19. That the document a attached hereto as Exhibit "A" has directly impacted your plaintiff's reputation amongst the general public, the press and media, his family and friends and other members of the law enforcement community, exposing your plaintiff to great embarrassment, ridicule, scandal and disgrace all to the damage of your plaintiff in an amount in excess of **$100,000.00.** (Emphasis added).

20. That as aforesaid, malice is the gist of this action. Furthermore the document attached hereto as Exhibit "A" was disseminated to the general public immediately before other members of the **CHICAGO ANIMAL RIGHTS COALITION** were about to be placed on trial after being arrested by sheriff deputies at the aforesaid rodeo in 1996; said dissemination being nothing more than an attempt to assassinate the integrity of the Lake County Sheriff's office and curry public favor and opinion immediately before a trial. Furthermore, the aforesaid document has been published and disseminated as a part of a massive public relations campaign begun by defendants prior to the 1997 Wauconda rodeo. Consequently, plaintiff is entitled to an award of **exemplary damages in an amount of at least $100,000.00.** (Emphasis added).

Wherefore, your plaintiff **JOHN VAN DIEN** prays this honorable court enter judgment in the amount of **compensatory damages of $100,000.00 plus $100,000.00 in exemplary damages or in such greater sum as a jury shall determine** against defendants **Steve Hindi** and **Greg Campbell**, both individually and doing business as The **CHICAGO ANIMAL RIGHTS COALITION**, plus cost of suit. (Emphasis added).

### PHASE FIVE
### THE GREG CAMPBELL TRIAL
### (SHANES AND JUDGE PHILLIPS)

67. Prior to **Campbell's** trial various officials at the **WCC** became alarmed and were assured by **Waller** and **Del Re** either directly or indirectly that **Campbell** would be convicted and no contact orders would be entered thereby eliminating the leadership of the protests at the up-coming Rodeo.

68. Sometime prior to **Campbell's** trial, **Shanes** in response to **Campbell's** defense discovery request, falsely responded that the State's Attorney's Office was unaware as to what had happened to the tape in **Piszczek's** camera.

69. **Shanes** was instructed either directly or indirectly by **Waller** to do everything in his power to cover-up **Van Dien's** crimes, this included but was not limited to permitting and encouraging **Winans** and **Van Dien** to testify falsely. **Waller** also told **Shanes** directly or indirectly that he could rely on the assistance of **Judge Phillips**. On May 20, 1997 **Campbell** had a jury trial before **Judge Phillips** (Case No. 96 CF 1913, 19th Judicial Circuit, Lake County).

70. **Shanes** permitted **Van Dien** and **Winans** to testify falsely at trial. At the trial the videotapes depicting the events of July 13, 1996 were admitted into evidence as Exhibit "3". **Judge Phillips** who viewed the same tapes was well aware of the events depicted in those tapes. **Judge Phillips** was also well aware that **Van Dien** had filed false police reports attempting to conceal his illegal seizure of the camera and subsequent destruction of its videotape. At no time did **Shanes** attempt to correct the testimony of **Winans** and **Van Dien**, which he knew to be false.

71. During the jury deliberations, the jurors made requests to review Exhibit "3"[7] which was the tape depicting the afore described events of July 13, 1996. Ultimately the jurors made a third request to see that tape at which time, **Judge Phillips** denied the jury's request. The following occurred.

> **THE COURT: There has been a request to watch the last two or three minutes of the tape. We would like to view it a second time. What you just viewed - - gentlemen, sidebar.**
> **(WHEREUPON the following proceedings were had**

---

[7] Exhibit "3" was a copy of the videotape that depicted among other events **Van Dien's** takedown of **Grushas** and **Van Dien's** illegal seizure and subsequent confiscation of **Piszczek's** videotape.

> outside of the hearing of the jury: )
> THE COURT:  My inclination is not to allow a second time.
> MR. SHANES:  I concur.
> MR. BRUNO:  I object.
> THE COURT:  It is getting to the point where they are putting too much emphasis on this particular piece of evidence.  I am going to instruct the jury that they have all of the evidence, they should consider it in connection with the tape.[8]
>> (WHEREUPON the following proceedings were had in the presence of the jury: )
> THE COURT:  Ladies and gentlemen, I am not going to permit another viewing of it.  The jury has viewed that now many times during the proceedings.  My instructions to you are to continue deliberating based upon the evidence you have reviewed.  If you would please retire and continue with deliberations.
>> (TR. May 20, 1997, PEOPLE OF THE STATE OF ILLINOIS v. GREG CAMPBELL, No. 96 CF 1913, pgs. 298-299).

72.  As a result of the combined perjury of **Winans** and **Van Dien**, and **Judge Phillips** invasion of the province of the jury, **Campbell** was convicted of obstructing a police officer and resisting arrest.

73.  Thereafter, at the State's request, **Judge Phillips** entered a No Contact Order against **Campbell**, which would effectively keep him from any meaningful protests at the 1997 Rodeo.  The parameters of **Judge Phillips'** Order violated clear decisions of the U.S. Supreme Court and other pertinent higher authority as to the extent to which injunctions may be issued against lawful protest.  **Judge Phillips** knew this to be the case, but pursuant to his conspiratorial agreements, entered an Order in a manner contrary to higher authority.

---

[8] The evidence that **Phillips** was referring to included the false testimony of **Van Dien** and **Winans**.

21

## PHASE SIX
## THE MICHAEL DURSCHMID TRIAL
## (JUDGE PHILLIPS)

74. In a related matter, People v. Durschmid; 96 CM 4119, October 10, 1997,

19th Judicial Circuit, Lake County, **Judge Phillips** presided over another jury trial.

75. In summary **Michael Durschmid** (hereinafter "**Durschmid**") during the July

13, 1996 protest over the Rodeo went into the rodeo ring with a bicycle lock around his

neck and lied down on the ground, refusing to move. The reason for **Durschmid's**

protest, which was his defense at trial, was that he took this extreme action to protest an

event at the Rodeo where small children were permitted to ride sheep. The children were

not given any protective gear whatsoever and of course the activity itself was injurious to

the sheep. At trial, despite **Judge Phillips** pretrial interference, **Durschmid** put on a

defense of necessity in response to the charge of criminal trespass that he had taken this

action to prevent the greater harm to the children and animals.

76. Prior to trial, **Durschmid** filed a notice of his intention to present the

affirmative defense of necessity. Prior to trial, **Judge Phillips** demanded that

**Durschmid** take the witness stand and explain his defense or else **Judge Phillips** would

not permit the defense to go forward. **Judge Phillips** at this time had also excluded an

expert witness sought to be called into the defense case. Despite **Durschmid's** attorney's

objections to this proceeding **Judge Phillips** persisted in his demand. As a result,

**Durschmid's** *Fifth* and *Fourteenth Amendment Rights* under the *U.S. Constitution* were

compromised; while the State received the benefit of what amounted to a discovery

deposition of **Durschmid's** defense. This procedure is entirely unauthorized by law.

77. The jury was instructed prior to rendering their verdict on the defense of necessity. The jury returned a verdict of not guilty on the criminal trespass to property and guilty on resisting arrest. The verdict given the instructions and evidence could not be interpreted in any other way then to mean that the **WCC** was engaging in a greater harm then **Durschmid's** excused otherwise criminal act.[9] Despite this fact, **Judge Phillips,** without legal or factual basis entered a No Contact Order against **Durschmid** at the State's request. Worse yet, even if **Judge Phillip's** decision were correct (which it was not) the injunction restricting **Durschmid's** *First Amendment rights* violated clearly established decisions of the U.S. Supreme Court restricting judicial power to enter injunctions against *First Amendment* protected activity. (**Judge Phillips'** unauthorized order effectively barred **Durschmid** from protesting at the Rodeo.)

## PHASE SEVEN
## THE FEDERAL LAWSUIT

78. Sometime in 1997, **CHARC, Campbell, Hindi,** and others filed a federal lawsuit (CHICAGO ANIMAL RIGHTS COALITION, et al. v. VILLAGE OF WAUCONDA, et al.; 97 C 4808, United States District Court, Northern Illinois, Northeastern Division). The suit against **Wauconda** was dismissed after the village conceded that their ordinance violated federal law and agreed to change same. During the course of the next two years various other aspects of the complaint were dismissed. The remainder of the case was tried in a bench trial before U.S. District Court **Judge James B. Moran** (hereinafter "**Judge Moran**"), on the single theory that the conduct of

---

[9] Illinois Rev. Stat.720 ILCS 5/7-13 reads as follows:
Necessity. Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct.

23

**Van Dien** and **Winans** had violated the *Fourteenth Amendment* to the *Constitution* of the *United States*, in that the defendants had used excessive force. At trial **Winans** testified and **Van Dien** did not; however, relevant portions of **Van Dien's** testimony from **Grushas** and **Campbell's** trials were received into evidence by **Judge Moran** as well as **Van Dien's** false police report of July 13, 1996. Most importantly, **Judge Moran** viewed a video tape which contained the same images that had been "reviewed" by the State's Attorney's Office, the Sheriff's Offices, and seen by **Judge Phillips** and **Shanes** in **Campbell's** case. **Judge Moran** found that the plaintiffs had been unable to prove excessive force in terms of the *Fourteenth Amendment* in "the shock the conscious test;" however, more germane to this claim are **Judge Moran's** specific findings of July 6, 1999. During his findings **Judge Moran** concluded the following, which in part stated:

> When Greg Campbell threw the radio, Officer Van Dien went after it. In his report and his earlier testimony, he reverses events. The radio goes from Greg Campbell to near Christine Grushas, and he trips and falls into Terri Campbell afterwards. His earlier testimony is not what happened. Actually it first landed near Terri Campbell before it went to Ms. Grushas . . .
> Finally, we have the claim of Suzanne Piszczek. Incidentally, the radio never was thrown toward her, contrary to Officer Van Dien's report. Captain Winans had her arm momentarily. Officer Van Dien pulled her away. She lost her balance and fell down. Officer Van Dien let her go. When she was on the ground, Officer Van Dien grabbed her camera. She then got up and was allowed to go. She was momentarily seized, which makes it a Fourth Amendment claim, but she was not arrested. She was not beaten, struck, kicked or otherwise subjected to any gratuitous violence. That is just not excessive force in the constitutional sense.
> The seizure of the camera adds some context but is not, particularly germane to an excessive force claim. Officer Van Dien is at best disingenuous when he says he picked up some unknown camera from the grass. Further, I don't see any basis for the seizure of the camera.
> The disappearance of the tape is at least highly suspicious. I did not, however, draw an inference against defendants because of the

disappearance because Ms. Piszczek testified she did not film either
the Campbell or the Grushas incident.

But, further, this is an excessive force claim. It is not a claim
that personal property was unlawfully converted. As I said when I
started, it was not a glorious few minutes in Lake County law
enforcement history, but that doesn't mean that the officers are liable
on the specific claims alleged. Therefore I find for the defendants.[10]
(Emphasis Added).

79. **Van Dien** was in the courtroom when the Judge published his findings,

thereafter **Gooch** and **Wysocki** received a copy of those findings.

### PHASE EIGHT
### VAN DIEN'S SUIT IS VOLUNTARILY DISMISSED
### VAN DIEN'S SUIT IS REINSTITUTED
### VAN DIEN GETS COLD FEET

80. Subsequent to **Judge Moran's** findings **Van Dien** voluntarily dismissed his

lawsuit on September 20, 2000. Immediately after the dismissal of **Van Dien's** lawsuit

various members of the **WCC** became concerned that the protestors would continue to

protest the 2001 and future Rodeos. Of particular concern to the **WCC** was the use of

video equipment by the protestors to document animal abuse. Representatives of the

**WCC** directly or indirectly contacted **Gooch** and **Wysocki** and sought their assistance in

preventing the protestors from at least using video recording equipment at future Rodeos.

**Gooch** and **Wysocki** directly or indirectly contacted **Waller** and **Del Re** in order to

secure their assistance in re-filing the suit, in particular, **Gooch** and **Wysocki** needed to

make the same false allegations about the Sheriff's and State's Attorney's investigation

into **Van Dien's** conduct. **Gooch** and **Wysocki** were informed directly or indirectly that

the Sheriff and State's Attorney would go along with this plan since it would benefit the

**WCC**.

---

[10] Findings of fact and conclusions of law July 6, 1999 TR 1-7. Case No. 97C4808.

81. **Van Dien** however got "cold feet" and refused to sign the verification as he had done in the original complaint. Disappointed, but undaunted, **Gooch** signed off on the complaint knowing full well that many of the allegations were patently false and contradicted by **Judge Moran's** specific findings. It was **Gooch's** plan that by reinstituting the suit he would be able to force a settlement, which would in effect provide a direct benefit to the **WCC**.

## PHASE NINE
## "THE SETTLEMENT AGREEMENT"
## (EXTORTION THE FINAL SOLUTION TO PROTESTOR PROBLEM)

82. After the July 2001 rodeo, on July 30, 2001 **Gooch** directed an associate to present a settlement agreement. The agreement Exhibit "2" reads in part:

2.      John Van Dien, Steve Hindi and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, hereby mutually agree to forever refrain and are herby prohibited from engaging in the following activities:

a. The taking of any photographic or visual depictions of any other party hereto without the express written consent of all persons to be photographically recorded, except as set forth below; including but not limited to by use of the following means: tape recording, audio-visual materials, cassette, printed, typed, hand produced, video, film, computer tapes or other recording devices, photographic, photograph slides, computer, transcriptions of verbal conversations or statements (however made), pictures or other matter which is able to be seen or read with or without mechanical or electronic assistance, sketches, slides, sound recordings, tape records, tapes, transcriptions, video tapes, video discs, voice recordings, written memorials of oral communications or any other hand generated or other electronic, chemical, mechanical processes.

b. The recording of any communications, whether with a party hereto or another person or agency/entity without the express written consent of the all parties to said communication, except as set forth below; including but not limited to the following means: tape recording, audio-visual materials, cassette, printed, typed, hand produced, video, film, computer tapes or other recording devices, photographic, photograph slides, computer, transcriptions of verbal conversations or statements (however made), pictures or other matter which is able to be seen or read with or without mechanical or electronic assistance, sketches, slides, sound recordings, tape records, tapes, transcriptions, video tapes, video

discs, voce recordings, written memorials of oral communications or any other hand generated or other electronic, chemical, mechanical processes.

    c. Further, John Van Dien, Steve Hind and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, herby mutually agree to forever refrain and are herby prohibited from directing, suggesting, intimating, or otherwise attempting or causing any employee, co-worker, fried, relative or any other person or entity from engaging in the activities afore described.

83. Given the parameters of this agreement all the **WCC** would need to do was to make sure that **Van Dien** was at the Rodeo. **Van Dien's** presence at the Rodeo in juxtaposition with the protestors who were always segregated at the Rodeo would prohibit the use of any tape or recording devices.

84. Defendants would receive nothing in exchange for abandoning their efforts to provide conclusive proof in their possession of **Van Dien's** criminal acts and the ensuing cover-up by the State's Attorney and Sheriff. At the time of this offer the statute of limitations on **Van Dien's** crimes had expired. However, if **Van Dien** were required to testify under oath at deposition and/or at trial, **Van Dien** when confronted with the now much discussed evidence, would have a choice to admit his past criminal conduct and trial perjury or be subject to perjury prosecution for his false testimony at deposition or at trial.

85. The "offer" on its face is ludicrous. The "offer" can only be understood in relation to the conspiratorial events which preceded it (paras. 16-81 of this complaint). In this context it is not an offer it is an **extortionate demand.** Meaning, plaintiffs surrender your *First Amendment rights* or face the conspirators' power to corrupt the courts of Lake County.

86. The offer was rejected.

## PHASE TEN
## GOOCH AND VAN DIEN
## GET "HAPPY FEET"

87. As previously mentioned on September 26, 2000, **Gooch** pursuant to his plan filed the second lawsuit (00L758, 19th Judicial Circuit, Lake County). During the course of the first lawsuit the defendants were *Pro Se*. This was not the case in the second lawsuit; at least two of the defendants were represented. Ultimately, the case was scheduled for trial in March 2002. Prior to that date, defendants (plaintiffs here) attorneys had sought to take **Van Dien's** deposition. **Gooch, Wysocki**, and **Van Dien** continually stalled and avoided presenting **Van Dien** for a deposition. Defendant's attorneys received a court order compelling **Van Dien's** deposition within a thirty-day period of time. Despite numerous phone calls, letters, and fax transmissions **Gooch** refused to set a date or have **Van Dien** appear for deposition.

88. As an alternative strategy defendants (plaintiffs here) attorney issued subpoenas to **Waller** and **Del Re** for trial. Attached to the subpoenas was an extensive rider detailing with annotation **Judge Moran's** findings and the fact that **Waller** and **Del Re** were being subpoenaed to explain their conclusions about "no criminal conduct based on the review of the tapes" which **Judge Moran** in his review reached a vastly different conclusion. (Complaint para. 78.)

89. On February 14, 2002, **Gooch** "voluntarily" dismissed **Van Dien's** suit for the second time.

90. As a direct and proximate result of the acts of the defendants and each of them, plaintiffs were denied full access and opportunity to exercise their *First Amendment rights*. **Hindi** and **CHARC** were required to expend time and money in the

defense of a suit falsely accusing them of libel. **CHARC** suffered depletion of its membership as a result of the intimidation created by the filing of the lawsuit. **CHARC** also lost the opportunity to recruit new members and was compromised in their fund raising efforts.

Wherefore plaintiffs pray for judgment against the defendants jointly and severally for actual and punitive damages to be determined at trial, reasonable attorney's fees and costs incurred in bringing suit, and such other and further relief as the Court deems reasonable and just in accordance with applicable rules of law and equity.

## COUNT II

### DECLARATORY AND INJUNCTIVE RELIEF AGAINST THE VILLAGE OF WAUCONDA AND CHIEF OF POLICE DANIEL QUICK

91. Plaintiffs reallege and reincorporate paras. 16-41 of Count I as though fully stated herein.

92. Plaintiffs reallege and reincorporate paras. 42-78 of Count I as though fully stated herein.

93. Plaintiffs reallege and reincorporate paras. 79-83 of Count I as though fully stated herein.

94. Sometime prior to December 2000, **Hindi** and **CHARC** purchased an Isuzu "box truck" which was modified so that it was outfitted with four video screens. Three of the screens, which were on each side and the rear, were 100-inch diagonal. The screen in the front of the truck was 60-inch diagonal. Above each screen was a Liquid Electronic Display readout, which appeared in red letters. Separately purchased was a Sony video "walkman" which was placed in the cabin so that the driver or operator could use its

monitor to check the video screen functions. The purpose of this truck was to display

mobile protest messages. The truck soon became known as the "Tiger Truck" ("Tiger").

95. Prior to April 4, 2001 the Tiger and its purpose were widely publicized

throughout Illinois and the United States. Examples of which below follow in part:

Television station KTNV, Ch. 13, Las Vegas, Nevada, December 1, 2000
He rode into town to steer attention to animal cruelty. Steve Hindi says
the National Final Rodeo is a multimillion dollar excuse for abuse.

Jace Radke, Las Vegas Sun, December 8, 2000
While thousands of rodeo fans make nightly trips to the National Finals
rodeo, Steve Hindi is driving in circles outside. Hindi, founder of
Showing Animals Respect and Kindness, is in Las Vegas with a high-tech
truck equipped with video screens that show steers' head being snapped
around after being roped by a cowboy.

Colorado Springs, Colorado (Headquarters of the Professional Rodeo Cowboys
Association), December 20, 2000, Channel (NBC)
Pictures of course, can speak a thousand words. And that's what one
animal rights group is counting on. This truck, equipped with three 100
inch video screens, spent the afternoon in Colorado Springs at the
Professional Rodeo Cowboys Association headquarters.

Television station KKTV (CBS), Colorado Springs, Colorado, December 20,
2000
Steve Hindi spent thousands on a truck and video equipment to protest
mistreatment of rodeo animals. Hindi says you can check out the
videotape to confirm what he's saying.

Kane County Chronicle (IL), December 28, 2000
Animal tights activist Steve Hindi of Elburn presented the newest and
most high-tech weapon against animal cruelty: The Tiger, a custom-made
truck equipped with a 60-inch video screen in the front, and 100-inch
video screens on each side and in the back. The screens display footage of
animals suffering in traps, including cats and dogs.

Mary Sanchez, Kansas City Star, January 3, 2001
Steve Hindi spent $150,00 on this custom-built *Isuzu*; its sides are
transformed into four large-screen televisions broadcasting gory
bullfighting scenes. PepsiCo, Mattel, and Anheuser-Busch all have been
targets. Pepsi ordered its promotional banners taken down from Mexican
bullrings. Mattel used to have a matador doll.

The Tiger is slick, imposing in its size. And, Hindi says, it is the best
ammunition he has for his fight against animal cruelty at rodeos, in
hunting and bullfights.

Brenda Schory, Kane County (IL) Chronicle, January 4, 2001 Headline:
On the loose. 'The Tiger' circles pedestrian prey.
The steer went down like 700 pounds of beef, roped and tied, horns half-
buried in sand, limpid brown eyes gazing back in weary resignation. This
is the "face" of rodeo. Steve Hindi wants the world to see. The close-up
footage is clearly visible on a truck called The Tiger.

John S. Sharp, Daily Herald (Chicago area), January 12, 2001
Driving to what amounted to a video billboard on wheels. Steve Hindi
took his message to the Illinois Capitol. Hindi's trip comes on the heels of
a stop in Detroit, where he confronted Daimler-Chrysler executives for
their sponsorship of rodeos.

Warner Saunders, NBC Channel 5 Television, Chicago, January 12, 2001
Animal rights activists have a new, high-tech tool to make their point. A
group called SHARK is driving a truck with three giant video screens.
They've already convinced Coca-Cola to pull their (rodeo) sponsorship.
SHARK says the pictures speak for themselves.

Sean Dalley, The State Journal-Register, Springfield, Illinois, January 12, 2001
Steve Hindi doesn't go halfway when he tries to make a point. Hindi put
on a video display outside the State Capitol Thursday evening. It was no
ordinary video, though. Hindi parked a truck with four large TV screens.
The video showed a calf being dragged by its neck across the dirt, tongue
hanging out and eyes bulging.

Nancy Chesley, Southern Illinoisan, January 14, 2001
A loop of rope hovered in the air, then descended over the calf's head. It
pulled taut around the neck, feeling the calf to the ground, where it was
dragged. The scene repeated itself over and over on four giant projection
screens, one on each side of a cube-shaped truck dubbed The Tiger -
animal rights activist Steve Hindi latest weapon in his war against rodeo
cruelty.

Merritt Clifton, Animal People (worldwide distribution), January/February 2001
Headline: SHARK shows Dodge who builds tough trucks
The Tiger can take graphic depictions of abuse directly to the public,
bypassing media gatekeepers . . . Hindi introduced the Tiger to Detroit
media as a 'concept vehicle,' and a 'revolution in engineering' - which it
is, involving the applications of TV technology never before attempted."
"Hindi and SHARK still have to raise the funds to pay off the prototype,
before they build more. But compared t the cost of broadcast time to

> distribute a much weaker version of the message for just 15 to 30 seconds
> a shot, Hindi's conclusion for the first trials is that the Tiger is a bargain.

Bill Page, Chicago Tribune Magazine, March 25, 2001
> Hindi flipped a few switches and the Tiger sprang to life. The four
> electronic boards flashed a message in foot-high letters of brilliant red:
> STOP ANIMAL ABUSE. The video screens popped on, and on all four
> sides appeared the image that had been on his home computer hours
> earlier: the calf running from its rodeo chute, then being pulled off its feet
> and dragged. The effect was stunning.

96. Prior to April 4, 2001, the Tiger traveled widely throughout Illinois and the United States delivering its message of protest without being cited for any traffic offenses including but not limited too: California: Beverly Hills, El Segundo, La Jolla, Los Angeles and suburbs, San Diego and suburbs, Santa Monica, Venice, West Hollywood. Illinois: Aurora, Batavia, Des Plaines, Chicago (including Navy Pier), Geneva, Highland Park, Loves Park, Machesney Park, North Aurora, Rockford, Springfield, and St. Charles. Michigan: Detroit and Auburn Hills. Minnesota: Golden Valley, Minneapolis, and Plymouth. Missouri: Kansas City and suburbs and St. Louis and suburbs. Nevada: Las Vegas. New York: Goshen and New York City (including Times Square).

97. After April 4, 2001 the Tiger traveled to the following destinations and again was not ticketed while delivering its protest massages including but not limited to: Arizona: Phoenix and suburbs and Prescott. California: Marin Del Re, Oceanside, San Francisco and suburbs, and San Louis Obispo. Colorado: Colorado Springs, Denver and suburbs. District of Columbia, Washington D.C. Georgia: Atlanta and suburbs. Idaho: Boise and suburbs, and Idaho Falls. Illinois: Unincorporated area of Lake County. Indianan: Indianapolis and suburbs. Kansas: Kansas City and suburbs. Montana: Bozeman and suburbs. New Mexico: Albuquerque and suburbs. North Carolina:

Raleigh.  Oregon:  Portland and suburbs.  Utah:  Ogden, Park City, Provo, Salt Lake City

and suburbs, and Unincorporated Davis County.  Washington:  Seattle and suburbs, and

Spokane and suburbs.  Wisconsin:  Milwaukee and suburbs.  Wyoming:  Cheyenne.

### "HOLD THAT TIGER"

98.  The **WCC** scheduled its Rodeo for July 2002.  In the months prior

**Wauconda**, **WCC** officials, and **Quick** were aware of the Tiger and of course anticipated

with trepidation its arrival in the Village.

99.  Prior to the April 4, 2001 **Wauconda** officials, **Quick,** and officials of the

**WCC** had many conversations concerning as to how to deal with the Tiger.

100.  **Quick,** in particular, was aware of the Tiger's travels throughout Illinois and

the lack of any law enforcement officials finding the Tiger to be in violation of traffic

laws of Illinois.[11]

101.  **Undeterred by the Constitutionally responsible performance of his**

**fellow law enforcement officers Quick** told selected **WCC** members and **Wauconda**

officials that he (**Quick**) would defend his village from the Tiger.

102.  For this purpose **Quick** devised a plan.  **Quick** either directly or indirectly

instructed Patrolmen John Combs, Badge 105, to effect a pretextual stop on April 4, 2001

when **Quick** had been informed that the Tiger had entered the **Wauconda** jurisdiction.

103.  Pursuant to **Quick's** direction Combs stopped **Hindi** and the Tiger on April

4, 2001.  The pretext for the stop was William's claim that there had been a report that

the Tiger had "almost caused an accident."  At the time of the stop Combs knew the Tiger

---

[11] For some period of time prior to April 2001, **Hindi** has been the target of Illinois law enforcement surveillance.  In various Illinois jurisdictions in which **Hindi** and others travel to protest animal abuse, law enforcement reports are made and transmitted to other law enforcement agencies in Illinois which are or may become the host sites for animal rights protests.

was presenting anti-Rodeo messages.  Pursuant to instructions Combs falsely charged

**Hindi** with violating *625 ILCS 5/12-212 subsection (c)*.  That section of the Illinois

vehicle code reads in full:

> § 12-212.  Special restrictions on lamps.  (a) No person shall drive or
> move any vehicle or equipment upon any highway with any lamp
> or device on the vehicle or equipment displaying a red light visible
> from directly in front of the vehicle or equipment except as
> otherwise provided in this Act.
> (b) Subject to the restrictions of this Act, flashing lights are
> prohibited on motor vehicles except as a means for indicating a
> right or left turn as provided in Section 12-208 or the presence of a
> vehicular traffic hazard requiring unusual care as expressly
> provided in Sections 11-804 or 12-215.
> (c) Unless otherwise expressly authorized by this Code, all other
> lighting or combination of lighting on any vehicle shall be
> prohibited.
> P.A. 76-1586, § 12-113, eff. July 1, 1970.  Renumbered § 12-212 by P.A.
> 77-37, § 1, eff. Jan. 1, 1972.  Amended by P.A. 81-879, § 1, eff. Sept. 21,
> 1979; P.A. 86-664, § 1, eff. Sept. 1, 1989.
> Formerly Ill.Rev.Stat.1991, ch. 95 1/2, ¶ 12-212.

104.  In zealous pursuit of **Quick's** instructions Officer Combs also charged

**Hindi** with a violation of *625 ILCS 5/12-604*.  That section of the Illinois vehicle code

reads in full:

> § 12-604.  Television receivers.
> (a) No motor vehicle operated on the highways of this State shall
> be equipped with television broadcast receiver equipment so
> located that the viewer or screen is visible from the driver's seat.
> (b) A visual display device permitted under this Section shall be
> attached to the vehicle in a manner that meets all applicable federal
> motor vehicle dash safety standards.
> (c) This section does not prohibit the use of television-type
> receiving equipment used exclusively for safety or traffic
> engineering studies.
> P.A. 76-1586, § 12-138, eff. July 1, 1970.  Renumbered § 12-604 by P.A.
> 77-37, § 1, eff. Jan. 1, 1972.  Amended by P.A. 77-1344, § 1, eff. Aug. 27,
> 1971; P.A. 77-2829, § 40, eff. Dec. 22, 1972; P.A. 78-255, § 61, eff. Oct.
> 1, 1973; P.A. 88- 415, § 10, eff. Aug. 20, 1993.
> Formerly Ill.Rev.Stat.1991, ch. 95 1/2, ¶ 12-604.

105.  This despite the fact that **Hindi** told and demonstrated to Combs that the Sony video "walkman" was not a television receiver. (e.g. incapable of receiving television signals).  Combs was not interested in the facts and told **Hindi**:

> Here's your license, this is a citation.  You want to go to court for this it's going to be May 8 if you wish to go to court, at 1:30 in Grayslake.  **If you be on the highway here, if its not turned off, you'll be receiving another one too.  OK?**

Combs reported his success to **Quick**.

106.  On April 14, 2001 **Hindi** again entered the boundaries of the **Wauconda** with the Tiger again displaying anti-Rodeo messages and was again falsely ticketed for violating *625 ILCS 5/12-212 subsection (c)*.  Unlike the previous arrest **Hindi** was not ticketed for having a "television" receiver.  **Sometime thereafter Quick was given the presidency of the WCC.**

107.  On March 12, 2002 **Hindi** went to trial in Branch 3 of the Circuit Court of Lake County, 19th Judicial Circuit, Grayslake, Illinois.  In <u>People the State of Illinois v. Steve Hindi</u> Case No. 91004.

108.  At trial **Hindi's** lawyer conceded that **Hindi** had unintentionally violated *section (a) of 625 ILCS 5/12-212* in that **Hindi** was guilty of having a red light (the LED message display) in the front of his vehicle.  The prosecutor accepted this representative admission and a finding of guilt as to this *section* only was entered against **Hindi**.  On the State's Motion the television receiver charge was dismissed.  Additionally, the single traffic offense from the April 14th, 2001 was also dismissed.  The later dismissal occurred on the prosecutor's representation that the arresting officer was no longer on the force.

109. From all of the above it is obvious that **Hindi** should have been if cited at all with the appropriate section dealing with "no front red light". **Hindi** then would have been able to turn off the front message display and continue on with his protected activity (displaying anti-Rodeo messages).

## DECLARATORY RELIEF

WHEREFORE, plaintiffs respectfully request that the Court make the following findings:

A) The facts alleged seek declaration of constitutionality of disputed application and enforcement of a State Statute.

B) The facts alleged assert a cause of action within federal jurisdiction.

C) An independent basis exists for federal jurisdiction.

D) The facts alleged show plaintiffs are subject to ongoing criminal prosecution and possible future criminal prosecution for exercise of *First Amendment rights*.

E) The facts alleged show actual controversy between parties having adverse legal interests.

F) The facts alleged establish an actual controversy ripe for adjudication.

G) A declaratory judgment will serve a useful purpose in clarifying and settling the legal relationships in issue.

H) The facts alleged show sufficient immediacy and reality to warrant issuance of declaratory judgment.

I) A declaratory judgment is a proper remedy to prevent an unconstitutional restriction on free speech.

J) A declaratory judgment will afford prospective relief.

K) A declaratory judgment will afford relief from uncertainty, insecurity, and controversy surrounding these proceedings.

L) Declaratory relief is appropriate.

WHEREFORE, plaintiffs respectfully pray for a declaratory judgment in accordance with the terms and provisions of *28 U.S.C.A. See. 2201* declaring:

AA) The plaintiffs' *rights* to the *First Amendment* include the right to engage in mobile signage for the exercise of their *First Amendment rights*. That the State of Illinois has not prohibited by regulation even commercial mobile signs.

BB) That the use of *625 ILCS 5/12-212(c)* to prevent plaintiffs from using mobile signage from presenting their non-commercial massage is un-constitutional and violative of their *First Amendment rights*.

CC) The defendants and their successors in office, and all the defendants' officers and agents are restrained from acting in any manner to enforce such statute in any manner, directly or indirectly, to interfere with the plaintiffs' exercise of their *First Amendment rights*.

DD) Judgment that the plaintiffs are to recover, their costs and attorneys' fees for this action.

EE) Judgment that the plaintiffs are entitled to such other relief as justice and equity require.

## INJUNCTIVE RELIEF
## AGAINST THE VILLAGE OF WAUCONDA
## AND CHIEF OF POLICE DANIEL QUICK

WHEREFORE, plaintiffs respectfully request that the Court make the following findings:

A) The plaintiffs will suffer substantial injury and damage depriving them of the proper exercise of their *First Amendment* from the enforcement of  *625 ILCS 5/12-212(c).*

B) The substantial injury and damage the plaintiffs will suffer from being deprived of the proper exercise of their *First Amendment rights* is an irreparable injury.

C) The plaintiffs have no adequate remedy at law to protect them in the proper exercise of their *First Amendment rights.*

D) The entry of an injunction will prevent a multiplicity of similar suits arising from the enforcement of *625 ILCS 5/12-212(c)* in the manner afore described.

E) That no bond is necessary or appropriate when the plaintiffs are attempting to exercise their *First Amendment rights.*

WHEREFORE, plaintiffs respectfully request that the Court order, adjudge and decreed that:

AA) The defendants, their agents and employees, and each of them be restrained and enjoined from enforcing the *625 ILCS 5/12-212.*

BB) The defendants, their agents and employees, and each of them be restrained and enjoined from interfering with the plaintiffs proper exercise of their *First Amendment rights.*

CC) The plaintiffs be granted a judgment for their costs and attorneys' fees.

DD) The plaintiffs be granted such other relief, as justice and equity require.

## COUNT III

### PENDENT ACTION UNDER THE LAWS OF THE STATE OF ILLINOIS CONSPIRACY TO COMMIT A MALICIOUS PROSECUTION

110. Plaintiffs reallege and reincorporate paras. 18-41 as though they were fully stated herein.

111. Plaintiffs reallege and reincorporate paras. 52-54 as though they were fully stated herein.

112. Plaintiffs reallege and reincorporate paras. 61-64 as though they were fully stated herein.

113. Sometime prior to May 14, 1997, defendants **Waller**, **Del Re**, **Gooch**, **Wysocki** and **Van Dien** agreed that **Van Dien** through **Gooch** and **Wysocki** as his attorneys would file a libel suit against plaintiffs.

114. Each knew that under the laws of the State of Illinois the suit would be instituted despite the fact that there was no legal or factual justification for filing such an action. It was the intention of the conspirators to punish and injure plaintiffs for their exercise of their *First Amendment rights* done in protest over animal abuse at the Wauconda Rodeo which in 1996 led to a series of events in which **Van Dien** as alleged in the preceding paragraphs had violated the criminal laws of the State of Illinois. This lawsuit additionally was a part of a proposed cover-up by the law enforcement officers involved in this conspiracy who are **Waller**, **Van Dien**, and **Del Re**.

115. It was a part of the plan that **Gooch** and **Wysocki** were assured directly or

indirectly by **Waller** and **Del Re** that they would falsely maintain that they had investigated plaintiffs' claims of **Van Dien's** misconduct occurring on July 13, 1996. **Gooch** and **Wysocki** agreed to make these allegations of "no misconduct" a part of **Van Dien's** libel suit. **Van Dien** agreed that he would falsely attest to the allegations in the lawsuit. (Filed a verified complaint).

**OVERT ACTS**
**THE CONSPIRATORS AND EACH OF THEM**
**DID ONE OR MORE OF THE FOLLOWING ACTS**
**IN FURTHERANCE OF THEIR CONSPIRATORIAL AGREEMENT**

116. On May 6, 1997 **Waller** stated to the *Daily Herald* that his office had reviewed the tapes and found no wrong doing on **Van Dien's** part.

117. On May 6, 1997 **Del Re** sated to the *Waukegan Daily News Sun* that on the basis of his and **Waller's** investigation and review of the videotapes there was "no basis to investigate."

118. On May 6, 1997 **Del Re** stated to the *Chicago Tribune* that he found "no basis for investigating misconduct."

119. Sometime prior to May 17, 1997 **Gooch** and **Wysocki** prepared a libel suit containing many false allegations and without which there was no justification for filing this action under the laws of the State of Illinois.

120. Prior to May 17, 1997 **Van Dien** signed and affirmation affixed to the suit by **Gooch** and **Wysocki** knowing that many of the allegations in the lawsuit were false.

121. On May 17, 1997 **Gooch** and **Wysocki** caused this false suit to be filed in

the Circuit Court of Lake County in a matter styled <u>JOHN VAN DIEN v. STEVE HINDI</u>
<u>and GREG CAMPBELL, individually and d/b/a CHICAGO ANIMAL RIGHTS</u>
<u>COALITION; 97 L 371.</u>

122. Between May 17, 1997 and November 2000, **Gooch** and **Wysocki** made
numerous court appearances and filed documents in court in the above styled case
knowing that they were maintaining a false prosecution.

123. Plaintiffs reallege and reincorporate paras. 78-79 as though fully stated
herein.

124. On September 20, 2000 the lawsuit was dismissed.

125. Plaintiffs reallege and reincorporate 80-87 as though fully stated herein.

126. The acts of the defendants and each of them were done maliciously.

127. The second voluntary dismissal on February 14, 2002 under the laws of the
State of Illinois is a termination in favor of the plaintiffs.

Wherefore plaintiffs pray for judgment against the defendants jointly and
severally for actual and punitive damages to be determined at trial, reasonable attorney's
fees and costs incurred in bringing suit, and such other and further relief as the Court
deems reasonable and just in accordance with applicable rules of law and equity.

PLAINTIFFS DEMAND TRIAL BY JURY IN ALL MATTERS AND COUNTS

SET FORTH IN THIS COMPLAINT WHERE PERMITTED BY LAW.

Respectfully Submitted,

Rick Halprin
Attorney for Plaintiffs
542 South Dearborn
Suite 750
Chicago, IL 60605
(312) 697-0022

CHARLES F. SCOTT

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

JOHN VAN DIEN,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )            97 L 3711
                                        )
STEVE HINDI and GREG CAMPBELL,          )     by jury of twelve demanded.
individually and d/b/a CHICAGO ANIMAL   )
RIGHTS COALITION,                       )
                                        )
        Defendants.                     )

F I L E D
MAY 14 1997

CIRCUIT CLERK

COMPLAINT

NOW COMES Plaintiff in his own proper person and by and through his attorneys

THOMAS W. GOOCH III and ALBERT L WYSOCKI of WYSOCKI & GOOCH, and as and

for his Complaint against Defendants shows to the court the following:

    1. That your plaintiff John Van Dien is a life-long resident of Lake County, Illinois. At

all times relevant to the matters complained of herein, your Plaintiff was and is a public official,

being a law enforcement officer employed by the Lake County Sheriff's Department, a division

of the County of Lake, a body politic.

    2. That your plaintiff is assigned to what is commonly referred to as "the Highway

Patrol" within the Lake County Sheriff's Department and as part of his assigned duties enforces

the laws of the State of Illinois and the County of Lake within his assigned jurisdiction which

includes unincorporated Wauconda Township.

**NOTICE**

BY LOCAL RULE 3.08

THIS CASE IS HEREBY SET FOR A SCHEDULING

CONFERENCE IN COURTROOM 204 ON 9/2

19 97, AT 9 00 AM/PM. FAILURE TO APPEAR MAY RESULT

IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT

BEING ENTERED.

**EXHIBIT**

1

3. That Defendant Steven Hindi is a resident of Plano, Illinois.

4. That Defendant Greg Campbell is a resident of Barrington, Illinois.

5. That Defendants Steven Hindi and Greg Campbell in their own individual capacities operate together, and with other as yet unknown and unnamed persons, an organization commonly known and referred to publically by defendants as the "CHICAGO ANIMAL RIGHTS COALITION". This action is brought against the named defendants both individually and doing business as the Chicago Animal Rights Coalition.

6. That during July of 1996 the defendants, together with other as yet unknown individuals, in their own individual capacities and doing business as the Chicago Animal Rights Coalition decided to picket and protest at the Wauconda Rodeo being given during July of 1996 in unincorporated Wauconda Township, Lake County, Illinois.

7. That during the aforesaid rodeo your plaintiff John Van Dien together with other sheriff's deputies, upon lawful orders by their superiors and upon observing probable cause to act, arrested several so-called "protestors" due to the conduct of the aforesaid protestors at the time of the event described in paragraph 6.

8. That at all times in making the aforesaid arrests your plaintiff and other law enforcement officers were following standard and acceptable police procedures in carrying out their official duties.

9. That at some time after the aforesaid arrests the defendants and other presently unknown persons accused your plaintiff and other sheriff's deputies of gross police misconduct in the performance of their official duties as set forth above and demanded a full investigation by the then Sheriff of Lake County, Clinton Grinnell and by the State's Attorney's office of Lake

2

County.

10. That a complete investigation was conducted by the Sheriff of Lake County and reviewed by the States Attorney's office of Lake County. All allegations of any type of police misconduct were found to be unsubstantiated and unbound. Further allegations of criminal conduct brought by the defendants against your plaintiff and others were determined to be unfounded.

11. That on one or more occasions prior to May 5, 1997, both the Sheriff of Lake County and the State's Attorney of Lake County, through their respective offices, and staff met with the defendants and other as yet unknown and unnamed persons and reviewed with them the results and conclusions of the aforesaid investigation.

12. That knowing that the plaintiff was not guilty of any crime or official police misconduct the defendants Steve Hindi and Greg Campbell together with other as yet unknown persons, individually and on behalf of The CHICAGO ANIMAL RIGHTS COALITION created and published a document captioned "WHEN WILL LAKE COUNTY INVESTIGATE BRUTAL SHERIFF'S DEPUTY?". A complete copy of the aforesaid document is attached hereto as Exhibit "A".

13. That on May 5, 1997 and thereafter, Defendants Steve Hindi, Greg Campbell and other as yet unnamed and unidentified persons individually and on behalf of The CHICAGO ANIMAL RIGHTS COALITION disseminated this document, set forth as Exhibit "A" attached hereto, to members of the general public by passing them out in front of the Lake County Sheriff's Office Building in Waukegan, Lake County, Illinois.

14. That at the time of the aforesaid dissemination the defendants and each of them acted

3

with actual malice by distributing the aforesaid document knowing that the allegations, as more fully set forth below were false and that your plaintiff and other Sheriff's deputies had been investigated as aforesaid and cleared of any wrongdoing. Furthermore, the defendants had been informed of the results of the aforesaid investigation prior to the acts of dissemination described above and in reckless disregard of the truth distributed the aforementioned document as aforesaid to the general public.

15. That there exists in the State of Illinois a certain criminal statute known as 720 ILCS 5/12-2; AGGRAVATED ASSAULT. The aforesaid offense is punishable by a term of imprisonment. The statute prohibits a person from placing another in fear of receiving a battery while on public property.

16. That there exists in the State of Illinois certain criminal statutes known as 720 ILCS 5/12-3; BATTERY and 720 ILCS 5/12-3.2; AGGRAVATED BATTERY The aforesaid offenses are punishable by terms of imprisonment. The aforesaid statutes prohibit a person from causing bodily harm or great bodily harm intentionally and without legal justification to another person.

17. That the statements set forth in the document attached hereto as Exhibit "A" accuse your plaintiff John Van Dien of one or more acts violating the criminal statutes set forth in paragraphs 15 and 16 above.

18. Further the document attached as Exhibit "A" hereto in its entirety was and is designed to injure Plaintiff's good standing as a law enforcement officer, injure plaintiff, bring him into public scandal, disrepute and disgrace by falsely and maliciously indicating to the general public that your plaintiff is a violent man who routinely brutalizes women while in his

4

official capacity as a law enforcement officer and who will in the future brutalize and assault

other women and girls; knowing full well as set forth above in paragraphs 13 and 14 that the

statements were false.

19. That the document attached hereto as Exhibit "A" has directly impacted your

plaintiff's reputation amongst the general public, the press and media, his family and friends and

other members of the law enforcement community, exposing your plaintiff to great

embarrassment, ridicule, scandal and disgrace all to the damage of your plaintiff in an amount in

excess of $100,000.00.

20. That as aforesaid, malice is the gist of this action. Furthermore the document

attached hereto as Exhibit "A" was disseminated to the general public immediately before other

members of the CHICAGO ANIMAL RIGHTS COALITION were about to be placed on trial

after being arrested by sheriff deputies at the aforesaid rodeo in 1996; said dissemination being

nothing more then an attempt to assassinate the integrity of the Lake County Sheriff's office and

curry public favor and opinion immediately before a trial. Furthermore, the aforesaid document

has been published and disseminated as a part of a massive public relations campaign begun by

defendants prior to the 1997 Wauconda rodeo. Consequently, Plaintiff is entitled to an award of

exemplary damages in amount of at least $100,000.00.

WHEREFORE, your plaintiff JOHN VAN DIEN prays this honorable court enter

judgment in the amount of compensatory damages of $100,000.00 plus $100,000.00 in

exemplary damages or in such greater sum as a jury shall determine against Defendants Steve

Hindi and Greg Campbell, both individually and doing business as The CHICAGO ANIMAL

RIGHTS COALITION, plus costs of suit.

5

Respectfully submitted,

WYSOCKI & GOOCH

_____
Thomas W. Gooch III

Plaintiff demands trial by jury of twelve.

_____
Thomas W. Gooch III

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to §1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
John Van Dien

Thomas W. Gooch III, Attorney at Law
Wysocki & Gooch
209 South Main Street
Wauconda, Illinois 60084
847/526-0110

Albert L. Wysocki, Attorney at Law
Wysocki & Gooch
300 N. Milwaukee Avenue, Suite G
Lake Villa, Illinois 60046
847/356-8333

6

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

SEP .. 2000

JOHN VAN DIEN, )
)
     Plaintiff, )
)
v. ) No.   00 L 75 R
)
STEVE HINDI and GREG CAMPBELL, )
individually and d/b/a CHICAGO ANIMAL )
RIGHTS COALITION, )
)
     Defendants. )

## COMPLAINT

NOW COMES Plaintiff in his own proper person and by and through his attorneys THOMAS W. GOOCH III and ALBERT L WYSOCKI of WYSOCKI & GOOCH, and as and for his Complaint against Defendants shows to the court the following:

    1. That your plaintiff John Van Dien is a life-long resident of Lake County, Illinois. At all times relevant to the matters complained of herein, your Plaintiff was and is a public official, being a law enforcement officer employed by the Lake County Sheriff's Department, a division of the County of Lake, a body politic.

    2. That your plaintiff is assigned to what is commonly referred to as "the Highway Patrol" within the Lake County Sheriff's Department and as part of his assigned duties enforces the laws of the State of Illinois and the County of Lake within his assigned jurisdiction which includes unincorporated Wauconda Township.

**EXHIBIT**

NO. 1(a)

3. That Defendant Steven Hindi is a resident of Plano, Illinois.

4. That Defendant Greg Campbell is a resident of Barrington, Illinois.

5. That Defendants S:... ; :::..ii and Greg Campbell in their own individual capacities operate together, and with other as yet unknown and unnamed persons, an organization commonly known and referred to publically by defendants as the "CHICAGO ANIMAL RIGHTS COALITION". This action is brought against the named defendants both individually and doing business as the Chicago Animal Rights Coalition. This action was originally filed as case number 97L371. The matter was voluntarily dismissed without prejudice in September of 2000, Plaintiff has attempted to pay defendant their costs from 97L371 and continues to so attempt. This matter has been re-filed within one year of the voluntary dismissal.

6. That during July of 1996 the defendants, together with other as yet unknown individuals, in their own individual capacities and doing business as the Chicago Animal Rights Coalition decided to picket and protest at the Wauconda Rodeo being given during July of 1996 in unincorporated Wauconda Township, Lake County, Illinois.

7. That during the aforesaid rodeo your plaintiff John Van Dien together with other sheriff's deputies, upon lawful orders by their superiors and upon observing probable cause to act, arrested several so-called "protestors" due to the conduct of the aforesaid protestors at the time of the event described in paragraph 6.

8. That at all times in making the aforesaid arrests your plaintiff and other law enforcement officers were following standard and acceptable police procedures in carrying out their official duties.

2

9. That at some time after the aforesaid arrests the defendants and other presently unknown persons accused your plaintiff and other sheriff's deputies of gross police misconduct in the performance of their official duties as set forth above and demanded a full investigation by the then Sheriff of Lake County, Clinton Grinnell and by the State's Attorney's office of Lake County.

10. That a complete investigation was conducted by the Sheriff of Lake County and reviewed by the States Attorney's office of Lake County. All allegations of any type of police misconduct were found to be unsubstantiated and unbound. Further allegations of criminal conduct brought by the defendants against your plaintiff and others were determined to be unfounded.

11. That on one or more occasions prior to May 5, 1997, both the Sheriff of Lake County and the State's Attorney of Lake County, through their respective offices, and staff met with the defendants and other as yet unknown and unnamed persons and reviewed with them the results and conclusions of the aforesaid investigation.

12. That knowing that the plaintiff was not guilty of any crime or official police misconduct the defendants Steve Hindi and Greg Campbell together with other as yet unknown persons, individually and on behalf of The CHICAGO ANIMAL RIGHTS COALITION created and published a document captioned "WHEN WILL LAKE COUNTY INVESTIGATE BRUTAL SHERIFF'S DEPUTY?". A complete copy of the aforesaid document is attached hereto as Exhibit "A".

13. That on May 5, 1997 and thereafter, Defendants Steve Hindi, Greg Campbell and other as yet unnamed and unidentified persons individually and on behalf of The CHICAGO

3

ANIMAL RIGHTS COALITION disseminated this document, set forth as Exhibit "A" attached hereto, to members of the general public by passing them out in front of the Lake County Sheriff's Office Building in Waukegan, Lake County, Illinois.

14. That at the time of the aforesaid dissemination the defendants and each of them acted with actual malice by distributing the aforesaid document knowing that the allegations, as more fully set forth below were false and that your plaintiff and other Sheriff's deputies had been investigated as aforesaid and cleared of any wrongdoing. Furthermore, the defendants had been informed of the results of the aforesaid investigation prior to the acts of dissemination described above and in reckless disregard of the truth distributed the aforementioned document as aforesaid to the general public.

15. That there exists in the State of Illinois a certain criminal statute known as 720 ILCS 5/12-2; AGGRAVATED ASSAULT. The aforesaid offense is punishable by a term of imprisonment. The statute prohibits a person from placing another in fear of receiving a battery while on public property.

16. That there exists in the State of Illinois certain criminal statutes known as 720 ILCS 5/12-3; BATTERY and 720 ILCS 5/12-3.2; AGGRAVATED BATTERY The aforesaid offenses are punishable by terms of imprisonment. The aforesaid statutes prohibit a person from causing bodily harm or great bodily harm intentionally and without legal justification to another person.

17. That the statements set forth in the document attached hereto as Exhibit "A" accuse your plaintiff John Van Dien of one or more acts violating the criminal statutes set forth in paragraphs 15 and 16 above.

4

18. Further the document attached as Exhibit "A" hereto in its entirety was and is designed to injure Plaintiff's good standing as a law enforcement officer, injure plaintiff, bring him into public scandal, disrepute and disgrace by falsely and maliciously indicating to the general public that your plaintiff is a violent man who routinely brutalizes women while in his official capacity as a law enforcement officer and who will in the future brutalize and assault other women and girls; knowing full well as set forth above in paragraphs 13 and 14 that the statements were false.

19. That the document attached hereto as Exhibit "A" has directly impacted your plaintiff's reputation amongst the general public, the press and media, his family and friends and other members of the law enforcement community, exposing your plaintiff to great embarrassment, ridicule, scandal and disgrace all to the damage of your plaintiff in an amount in excess of $100,000.00.

20. That as aforesaid, malice is the gist of this action. Furthermore the document attached hereto as Exhibit "A" was disseminated to the general public immediately before other members of the CHICAGO ANIMAL RIGHTS COALITION were about to be placed on trial after being arrested by sheriff deputies at the aforesaid rodeo in 1996; said dissemination being nothing more then an attempt to assassinate the integrity of the Lake County Sheriff's office and curry public favor and opinion immediately before a trial. Furthermore, the aforesaid document has been published and disseminated as a part of a massive public relations campaign begun by defendants prior to the 1997 Wauconda rodeo. Consequently, Plaintiff is entitled to an award of exemplary damages in amount of at least $100,000.00.

WHEREFORE, your plaintiff JOHN VAN DIEN prays this honorable court enter

5

judgment in the amount of compensatory damages of $100,000.00 plus $100,000.00 in

exemplary damages or in such greater sum as a jury shall determine against Defendants Steve

Hindi and Greg Campbell, both individually and doing business as The CHICAGO ANIMAL

RIGHTS COALITION, plus costs of suit.

Respectfully submitted,

WYSOCKI & GOOCH

Thomas W. Gooch III

Thomas W. Gooch III, Attorney at Law
Wysocki & Gooch
209 South Main Street
Wauconda, Illinois 60084
847/526-0110

Albert L. Wysocki, Attorney at Law
Wysocki & Gooch
300 N. Milwaukee Avenue, Suite G
Lake Villa, Illinois 60046
847/356-8333

# WHEN WILL LAKE COUNTY INVESTIGATE BRUTAL SHERIFF'S DEPUTY?

One evening last July, a man brutalized and assaulted three women outside Wauconda. This is, of course, a horrendous and disgusting crime. But the worst part about it is that the assailant was a Lake County Sheriff's Deputy!

The assailant, Deputy John VanDien, weighs almost three hundred pounds. None of his victims weigh more than 130 pounds. One of them only weighs ninety pounds. Van Dien actually arrested one of the women, in an attempt to cover up his crime. She went to court, and was found not guilty!

Fortunately, Deputy VanDien was videotaped assaulting two of the women. You would think that this would make the punishment of this unfit police officer easy. Regrettably, this has not been the case.

Ever since the assaults, citizens have been trying to get Sheriff Gary Del Re or State's Attorney Michael Waller to investigate. Both have steadfastly refused. Why?

See what you think! Just ask a protester, and you can see the assaults on video for yourself - right here - right now! You should see it, because we don't need bad police officers. **The next victim might be your wife, your daughter, your mother, or even you!**

**EXHIBIT**

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

1.      For and in consideration of the terms set forth herein, the undersigned, John Van Dien, Steve Hindi and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, hereby mutually acquit, release and forever discharge each other from any and all action or causes of actions accruing to this date of general release and and settlement agreement, including and not limited to those set forth in a certain cause action known as " John Van Dien, Plaintiff, v. Steve Hindi and Greg Campbell, individually and d/b/a Chicago Animal Rights Coalition, Defendants," Lake County Court Case No. 00 L 758, Lake County, Illinois; and from any claims or demands for damages, costs, attorney fees, accrued or other interest, expenses, compensation, consequential damage or any other thing whatsoever on account, of or in any way growing out of, any and all known and unknown damage resulting from the allegations set forth in the aforementioned cause of action.

2.      John Van Dien, Steve Hindi and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, hereby mutually agree to forever refrain and are hereby prohibited from engaging in the following activities:

a. The taking of any photographic or visual depictions of any other party hereto without the express written consent of all persons to be photographically recorded, except as set forth below; including but not limited to by use of the following means: tape recording, audio-visual materials, cassette, printed, typed, hand produced, video, film, computer tapes or other recording devices, photographic, photograph slides, computer, transcriptions of verbal conversations or statements (however made), pictures or other matter which is able to be seen or read with or without mechanical or electronic assistance, sketches, slides, sound recordings, tape records, tapes, transcriptions, video tapes, video discs, voice recordings, written memorials of oral communications or any other hand

**EXHIBIT**

generated or other electronic, chemical, mechanical processes.

b. The recording of any communications, whether with a party hereto or another person or agency/entity without the express written consent of the all parties to said communication, except as set forth below; including but not limited to the following means: tape recording, audio-visual materials, cassette, printed, typed, hand produced, video, film, computer tapes or other recording devices, photographic, photograph slides, computer, transcriptions of verbal conversations or statements (however made), pictures or other matter which is able to be seen or read with or without mechanical or electronic assistance, sketches, slides, sound recordings, tape records, tapes, transcriptions, video tapes, video discs, voice recordings, written memorials of oral communications or any other hand generated or other electronic, chemical, mechanical processes.

c. Further, John Van Dien, Steve Hindi and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, hereby mutually agree to forever refrain and are hereby prohibited from directing, suggesting, intimating, or otherwise attempting or causing any employee, co-worker, fried, relative or any other person or entity from engaging in the activities afore described.

3. John Van Dien shall not be prohibited by this settlement agreement from conducting, participating or otherwise engaging in any of activities which are necessary to the performance of his duties as a law enforcement officer, and nothing set forth herein, specifically those prohibited activities aforementioned in Paragraph 2 above, shall be applicable to John Van Dien in fulfilling his law enforcement duties.

4. Steve Hindi and Greg Campbell, both individually and on behalf of Chicago Animal Rights Coalition, and John Van Dien hereby expressly agrees that in the event any of the parties to

this settlement failure to abide by the any of the terms set forth above, the offending party shall be liable to the party seeking enforcement of the settlement agreement for any court cost, cost of suit, and attorney's fees which may be incurred in any type of proceeding or action arising from or brought in an effort to enforce the terms of this settlement agreement against that offending party.

5.  We hereby acknowledge no promise or inducement which is not herein expressed has been made to us, and in executing this release we do not rely upon any statement or representation made by any person, firm or corporation, hereby released.

6.  We understand that this settlement is the compromise of a doubtful and disputed claim, and that the agreement set forth herein is not to be construed as an admission of liability on the part of the persons, firms and corporations hereby released by whom liability is expressly denied.

7.  This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

8.  We further state that we have carefully read the foregoing release and know the contents thereof, and we sign the same as our own free will.

9.  Further, we agree to hold said parties harmless from any and all claims asserted by the undersigned or their heirs and assigns, arising out of this cause of action or any other cause of action accruing to the date of this settlement agreement and general release.

**Accepted and Agreed to:**

_____
Steve Hindi, both individually and on
behalf of Chicago Animal Rights Coalition

SUBSCRIBED and SWORN to before
me this ___ day of _____, 2001.

_____, Notary Public.

_____
Greg Campbell, both individually and on
behalf of Chicago Animal Rights Coalition

SUBSCRIBED and SWORN to before
me this _____ day of _____, 2001.

_____, Notary Public.

**Accepted and Agreed to:**

_____

**JOHN VAN DIEN**


SUBSCRIBED and SWORN to before
me this _____ day of _____, 2001.


_____

Notary Public

Prepared by:
CHRISTINE A. BEDARD
WYSOCKI & GOOCH
209 S. Main Street
Wauconda, IL 60084
(847) 526-0110
July 27, 2001

Civil Cover Sheet

*Cat 2*

http://www.ilnd.uscourts.gov/PUBLIC/Forms/auto_js44.c

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet  02C 292 7

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE JOHN W DARRAH

**Plaintiff(s): STEVE HINDI and GREG CAMPBELL and SHARK (SHOWING ANIMALS REPECT AND KINDNESS), formerly known as CHARC (CHICAGO ANIMAL RIGHTS COALITION)**

**Defendant(s):THOMAS GOOCH III, ALBERT WYSOCKI, JOHN VAN DIEN, GARY DEL RE, The Sheriff of Lake County, The VILLAGE OF WAUCONDA, a municipal corporation, and DANIAEL QUICK, The Chief of Police of The Village of Wauconda**

DOCKETED

County of Residence: KANE

Plaintiff's Atty:    RICK HALPRIN
542 SOUTH DEARBORN,
SUITE 750
CHICAGO, IL 60605
312-697-0022

County of Residence: LAKE

Defendant's Atty:

APR 2 4 2002

MAGISTRATE JUDGE SCHENKIER

II. Basis of Jurisdiction:    **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
Plaintiff:-**1 Citizen of This State**
Defendant:-**1 Citizen of This State**

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **890 Other Statutory Actions**

VI.Cause of Action:    **CIVIL RIGHTS ACT 42 U.S.C. sec. 1981, 1983, 1988 and 28 U.S.C. sec. 1331, 1343(a), 1367(a)**

VII. Requested in Complaint
Class Action:**No**
Dollar Demand:**unspecified**
Jury Demand:**Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:    _Apr. 24 2002_