# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2927 | **DATE** | March 19, 2003 |
| **CASE TITLE** | Hindi v. Gooch et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Wauconda and Quick's Motion to Dismiss [41-1] is granted. Count II of Plaintiffs' First Amended Complaint is dismissed with prejudice. Gooch and Wysocki's Motion to Dismiss [44-1] and Van Dien's Motion to Dismiss [45-1] are granted in part and denied in part. Count III of Plaintiffs' First Amended Complaint is dismissed without prejudice. Responsive pleadings to be filed on or before April 18, 2003. Status hearing is set for April 24, 2003 at 9:00 a.m.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | MAR 2 1 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 62 |
| √ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | date mailed notice | | |
| | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 MAR 20 PM 6:10 FILED-DATE | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

DOCKETED
MAR 2 1 2003

STEVE HINDI; GREG CAMPBELL; and )
SHARK (SHOWING ANIMALS RESPECT AND )
KINDNESS), formerly known as )
CHARC (CHICAGO ANIMAL RIGHTS )
COALITION), )
                                   )     No. 02 C 2927
        Plaintiffs, )
                                   )     Judge John W. Darrah
     v. )
                                   )
THOMAS GOOCH III; ALBERT WYSOCKI; )
JOHN VAN DIEN; GARY DEL RE, The Sheriff of )
Lake County; MICHAEL WALLER, States Attorney )
of Lake County; THE VILLAGE OF WAUCONDA, a )
Municipal Corporation; and DANIEL QUICK, The )
Chief of Police of the Village of Wauconda, )
                                   )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Steve Hindi ("Hindi"), Greg Campbell ("Campbell"), and Showing Animals Respect and Kindness ("SHARK"), filed suit against Defendants, Thomas Gooch III ("Gooch"), Albert Wysocki ("Wysocki"), John Van Dien ("Van Dien"), Gary Del Re ("Del Re"), Michael Waller ("Waller"), the Village of Wauconda ("Wauconda"), and Daniel Quick ("Quick"). Count I alleges conspiracy to retaliate for the exercise of First Amendment rights. Count II seeks declaratory and injunctive relief against Wauconda and Quick. Count III alleges conspiracy to commit a malicious prosecution.

Currently before the Court is Wauconda and Quick's Motion to Dismiss, Gooch and Wysocki's Motion to Dismiss, and Van Dien's Motion to Dismiss. In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables,*

*Inc.*, 205 F.3d 323, 326 (7th Cir. 2000) (*Marshall-Mosby*). Dismissal is warranted only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The plaintiff need not state all the facts necessary to establish the claim; and the "suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).

Although the First Amended Complaint contains three counts, the underlying allegations are myriad and somewhat complicated. Accordingly, it is appropriate to set out all these operative allegations necessarily considered in support and in defense of the motions before analyzing them pursuant to the applicable law. The Court emphasizes that the following is a summary of the allegations set out in Plaintiffs' First Amended Complaint.

*Background Facts*

The Wauconda Chamber of Commerce ("WCC") has presented the annual Wauconda Rodeo ("Rodeo") for many years. The Rodeo is held, in part, to promote local business interests in return for sponsorship of the Rodeo by these businesses. The WCC charges admission to the Rodeo as a public event. Wauconda supports and promotes the Rodeo. In recent years, the Rodeo has been held at the Golden Oaks Farms ("Farm"). The Farm is adjacent to two public ways: Case Road and Route 12.

In 1993, persons organized as the North West Animal League and the Chicago Animal Rights Coalition ("CHARC") to protest the maltreatment of circus and rodeo animals and the Rodeo's alleged violation of the Humane Care of Animal Act. In 1994, some of the present Plaintiffs, who were members of CHARC, undertook various activities to protest the Rodeo, including picketing

various Wauconda businesses that sponsor the Rodeo. On June 21, 1994, in reaction to the protests, the Wauconda Village Board enacted an ordinance entitled, "Parades and Assemblies on Public Property."

The WCC contracted with the Lake County Sheriff's Office to provide deputy sheriffs as privately paid "security forces" for the Rodeo. The WCC, through its officers, directors, and/or spokespersons at the Rodeos in 1994, 1995, 1996, and 1997, directed the activities of the deputies. In 1995, by agreement with and under the direction of the WCC, the deputy sheriffs restricted the Plaintiffs' demonstration to an area selected by the WCC, which provided no access to the Rodeo audience. The deputies ordered the protesters to keep moving and demanded the abandonment of the protesters' banners. The deputies also prohibited the protesters from displaying signs and from videotaping the protest and actions of police officers at the protest. The deputies threatened to charge the protesters with various criminal charges, including mob action, conspiracy, and violations of eavesdropping law if any of their orders were not followed. Prior to this time, Del Re publicly stated that the use of megaphones for protest was legal. Nevertheless, during the Rodeo, Captain Frank Winans ("Winans") told the protesters that, because some of the Rodeo sponsors and participants objected to the protesters' amplified messages, the continued use of the megaphones would be deemed as disorderly conduct and would result in the protesters' arrests.

In 1995, Van Dien arrested Campbell and Hindi, charging them with disorderly conduct for their use of megaphones in their protests. At the time of the arrests, Van Dien was aware that Hindi and Campbell were the leaders of CHARC. The charges were later dismissed by the Lake County State's Attorney's Office.

3

### The July 1996 Incidents

On July 13, 1996, Winans and Van Dien were part of a security detail at the annual Rodeo. Winans and Van Dien noticed three paragliders and one hot-air balloon flying in the vicinity of the Rodeo. Winans and Van Dien believed that the paragliders and the balloon were associated with a protest. Winans and Van Dien both knew Campbell and his wife, Terri Campbell ("Terri"), from previous Rodeo encounters. Both Winans and Van Dien also knew that Terri suffered from advanced Multiple Sclerosis and that she required a cane for walking and was required to sit frequently as a result of her disability.

On this day, Winans and Van Dien approached Campbell, who was surrounded by a small group of protesters. At the same time, another member of CHARC, Sue Piszczek ("Piszczek"), was operating a handheld video camera. An independent news cameraman and reporter were also videotaping the protest. Winans approached Campbell and ordered Campbell to use Campbell's handheld radio to order the gliders out of the Rodeo area. Winans told Campbell that if he did not comply, he would be charged with mob action. Campbell truthfully responded that the radio battery was dead. Winans attempted to grab the radio from Campbell, who threw it over his shoulders into the air. Immediately thereafter, Van Dien, who at the time was approximately 6'4" and weighed over 250 pounds, charged towards the protesters. Terri and another protester were standing in the area where the radio landed and walked to pick up the radio. As they did so, Van Dien knocked Terri to the ground. The radio then flew in the direction of Christine Grushas ("Grushas"). Van Dien continued his "charge", tackling Grushas to the ground and knocking the radio to the ground.

4

In the interim of these events, Winans ordered Campbell's arrest. He also went near Grushas and retrieved the radio. At or about the same time, Piszczek yelled "It's all on film Winans." Winans then order Van Dien to arrest Grushas.

Van Dien proceeded to grab Piszczek, who suffers from Spina Bifida and weighed 90 pounds. Piszczek fell to the ground, and Van Dien forcibly twisted the camera from Piszczek's hand and tucked the camera under his arm. Piszczek was not arrested.

Van Dien hid the camera under Grushas's backpack, concealing it from casual view, and escorted Grushas to the area of the Rodeo where deputies maintained a padywagon for detention. Van Dien then took Piszczek's video camera and removed the tape from the camera and confiscated it pursuant to instructions from Winans. Thereafter, on instructions from Winans, Van Dien filed false official police reports indicating that he had found the camera lying on the grass. Piszczek's camera was inventoried as evidence without the tape.

Campbell, Hindi, and several other CHARC members were also arrested and charged with disorderly conduct for their use of megaphones during their protest. Subsequently, the State's Attorney's Office dismissed all charges against all of those arrested.

Following the dismissal of the charges, Campbell and Hindi, as well as other CHARC members, made public statements of their intent to bring public suit to secure their rights under the First Amendment. Thereafter, the State's Attorney and Waller reinstated the disorderly conduct charges and added the charges of conspiracy to commit disorderly conduct against the same individuals.

Also on July 13, 1996, Michael Durschmid ("Durschmid") went into the Rodeo ring with a bicycle lock around his neck and lied down on the ground, refusing to move. Durschmid took this

action to protest an event at the Rodeo in which small children were allowed to ride sheep. The children were not allowed to wear protective gear, and Durschmid believed that the activity was harmful to the sheep. Durschmid was arrested based on his conduct and charged with criminal trespass to property and resisting arrest.

*The Conspiracy*

Prior to February 10, 1997, Waller and Del Re agreed to cover up the criminal acts committed by Winans and Van Dien that occurred on July 13, 1996; and they agreed to destroy, or at least substantially compromise, CHARC's ability to protest the annual Rodeo and to document animal abuse. In general, Waller and Del Re agreed that they would secure the criminal convictions of Hindi and Campbell as well as a number of other protesters. To implement this plan, Waller, Del Re, Winans, and Van Dien agreed that Van Dien and Winans would testify falsely at the forthcoming criminal trials. Waller and Del Re also agreed to cover up Van Dien's seizure of Piszczek's camera and subsequent destruction of the tape and Van Dien's filing of false reports.

Waller and Del Re also sought to directly benefit their own political interests by conferring a direct benefit on the WCC. Waller and Del Re schemed to receive "No Contact Orders" against any of the convicted individuals (Plaintiffs in the instant case). Such an order would prohibit a convicted defendant from contact with the victim. Waller and Del Re knew that such an order would be difficult to obtain. However, they also knew that their offices had the power to influence certain judges in Lake County.

In order to implement their plan, Waller recruited Daniel Shanes ("Shanes"), an Assistant State's Attorney. Waller knew that Shanes would do anything to advance his career. Waller and

6

Del Re also knew that the judge most likely to hear the bulk of the 1996-protester cases would be Judge Phillips. Waller and Del Re both knew and agreed that Judge Phillips could be corrupted by the combined influence of their offices and the WCC.

*The Grushas Trial*

Grushas's trial was set for February 10, 1997. Sometime prior to this date, Shanes was provided videotapes made by the protesters and the independent news crew depicting the events of July 13, 1996. In September 1996, Waller and Del Re were personally made aware of the tapes which depicted the events of July 13, 1996. Waller instructed Shanes to cover up Van Dien's false police reports. Shanes agreed with Van Dien that Van Dien would testify falsely to cover up his conduct of July 13, 1996.

At Grushas's bench trial, heard by Judge Lawler, Van Dien testified falsely about the July 13, 1996 events. Judge Lawler acquitted Grushas after his review of the videotape provided by Grushas which depicted Van Dien's conduct.

*Hindi Publicizes the July 13, 1996 Videotapes*

On May 5, 1997, Hindi appeared in front of the Lake County Sheriff's Office equipped with the videotape and a monitor showing Van Dien seizing Piszczek's camera and confiscating the tape within the camera. In addition, Hindi distributed a leaflet inviting persons to view the videotape. The leaflets read:

**WHEN WILL LAKE COUNTY INVESTIGATE**
**BRUTAL SHERIFF'S DEPUTY?**

One evening last July, a man brutalized and assaulted three women outside Wauconda. This is, of course, a horrendous and disgusting crime. But the worst part about it is the assailant was a <u>Lake County Sheriff's Deputy!</u>

7

The assailant, Deputy John Van Dien, weighs almost <u>three hundred pounds</u>. None of his victims weigh more than 130 pounds. <u>One of them weighs ninety pounds.</u> Van Dien actually arrested one of the women, in an attempt to cover up his crime. She went to court, and was found <u>not guilty!</u>

Fortunately, Deputy Van Dien was videotaped assaulting two of the women. You would think that this would make the punishment of this unfit police officer easy. Regrettably, <u>this has not been the case.</u>

Ever since the assaults, citizens have been trying to get Sheriff Gary Del Re or State's Attorney Michael Waller to investigate. Both have steadfastly refused. Why?

See what you think! Just ask a protester, and you can see the assaults on video for yourself - right here - right now! <u>You should see it, because we don't need bad police officers.</u> **The next victim might be your wife, your daughter, your mother, <u>or even you!</u>**

Hindi's actions of May 5, 1997 were well publicized. In response, Waller stated in an interview that his office reviewed the tapes and that they "found no wrong-doing on Van Dien's part." Waller also stated to newspaper reporters that they did not find any "basis to investigate".

Waller and Del Re subsequently recruited attorneys Gooch and Wysocki. Gooch and Wysocki were informed that they would receive the full support of Waller and Del Re in filing a suit against Hindi for libel. The attorneys were assured by Waller and Del Re that they could rely on Waller and Del Re's false assertions concerning their investigation into Van Dien's conduct on July 13, 1996, and their findings of no misconduct.

On May 14, 1997, Gooch and Wysocki filed suit in Lake County Circuit Court, *Van Dien v. Hindi, Campbell, individually and d/b/a Chicago Animal Rights Coalition*. The suit was executed by Van Dien and falsely stated that Van Dien was not guilty of any crime or official police misconduct. The suit alleged that Hindi's May 5, 1997 actions constituted libel.

## The Campbell Trial

On May 20, 1997 Campbell received a jury trial before Judge Phillips for his July 1997 conduct. Prior to the trial, various officials at WCC became alarmed and were assured by Waller and Del Re that Campbell would be convicted and that a no-contact order would be entered, thereby eliminating the leadership of the protests at the upcoming Rodeo. Also before trial, Shanes responded to Campbell's defense discovery request that the State's Attorney's Office was unaware what had happened to the tape in Piszczek's camera. Shanes was instructed by Waller to do everything in his power to cover-up Van Dien's crimes, including permitting and encouraging Winans and Van Dien to testify falsely. Waller also told Shanes that he could rely on the assistance of Judge Phillips.

At the trial, Van Dien and Winans testified falsely as to what occurred on July 13, 1996. Videotapes depicting the events were admitted into evidence. At no time did Shanes attempt to correct Winans and Van Dien's testimony, which he knew to be false. During the jury deliberations, the jurors requested to review the videotape depicting the July 13, 1996 events. Ultimately, the jurors made a third request to see the tape to which Judge Phillips denied. Judge Phillips stated that he was not inclined to allow the jurors to see the videotape a second time and that it was "getting to the point where they are putting too much emphasis on this particular piece of evidence...." The jury convicted Campbell of obstructing a police officer and resisting arrest.

Following the trial, Judge Phillips entered a No-Contact Order against Campbell, which effectively kept Campbell from any meaningful protests at the 1997 Rodeo. Judge Phillips entered the order knowing that it violated clear decisions of the United States Supreme Court and other pertinent higher authority as to the extent to which injunctions may be issued against lawful protests.

*The Durschmid Trial*

On October 10, 1997, Durschmid had a jury trial for his arrest of July 13, 1996.

Judge Phillips presided over the trial. Prior to trial, Durschmid filed a notice of his intention to

present the affirmative defense of necessity in response to the charge of criminal trespass, arguing

that he took his action to prevent the greater harm to the children and the animals. Judge Phillips

demanded that Durschmid take the witness stand and explain his defense or else he would not permit

the defense to go forward. Durschmid took the stand and explained his necessity defense, allowing

the State to benefit to what amounted to a discovery deposition of Durschmid's defense.

At trial, Durschmid put on the defense of necessity. The jury returned a verdict of not guilty

on the criminal trespass to property charge and guilty of resisting arrest. Judge Phillips entered a No

Contact Order against Durschmid at the State's request. The order effectively barred Durschmid

from protesting at the Rodeo.

*The Federal Civil Lawsuit*

Sometime in 1997, Hindi, Campbell, CHARC, and others filed a federal lawsuit against

multiple entities. The suit against Wauconda was dismissed after the village conceded that their

ordinance violated federal law and agreed to change the ordinance. During the course of the next

two years, various aspects of the complaint were dismissed. The remainder of the case was tried in

a bench trial before United States District Court Judge James Moran ("Judge Moran"), on the single

theory that the conduct of Van Dien and Winans had violated the Fourteenth Amendment of the

United States Constitution in that Van Dien and Winans used excessive force.

At trial, Winans testified, and Van Dien did not testify. However, relevant portions of

Van Dien's testimony from Grushas's and Campbell's trials were received into evidence. Judge Moran also reviewed the police reports and the videotape of the July 13, 1996. Judge Moran found that the plaintiffs had not proven excessive force in terms of the Fourteenth Amendment under the "shock the conscious test". However, Judge Moran also found that "Officer Van Dien is at best disingenuous when he says he picked up some unknown camera from the grass. Further, I don't see any basis for the seizure of the camera. The disappearance of the tape is at least highly suspicious...."

*The Van Dien Civil Lawsuit*

On September 20, 2000, subsequent to Judge Moran's findings, Van Dien voluntarily dismissed his civil lawsuit that was filed on May 14, 1997 in Lake County Circuit Court. Immediately after the dismissal of Van Dien's lawsuit, various members of the WCC became concerned that the protesters would continue to protest the 2001 and future rodeos. Of particular concern to the WCC was the use of video equipment by the protesters to document animal abuse. Representatives of the WCC contacted Gooch and Wysocki, seeking their assistance in preventing the protesters from at least using video recording equipment at future Rodeos. Gooch and Wysocki contacted Waller and Del Re in order to secure their assurance in re-filing the lawsuit. Gooch and Wysocki were informed that the Sheriff and State's Attorney would go along with the plan since it would benefit the WCC.

However, Van Dien refused to sign the verification of the complaint. Gooch signed off on the complaint, knowing that many of the allegations were false and contradicted by Judge Moran's specific findings.

Following the July 2001 Rodeo, Gooch directed an associate to present a settlement agreement to settle the Van Dien civil lawsuit. The proposed settlement agreement provided, in part, that Hindi, Campbell, and CHARC would forever refrain from taking any photographic or visual depictions of any of the parties. Pursuant to the proposed settlement agreement, if Van Dien was at the Rodeo, the use of any tape or recording devices would be prohibited. The settlement agreement was rejected.

Prior to the trial date for the Van Dien civil lawsuit, the defendants in that suit sought to take Van Dien's deposition. Gooch, Wysocki, and Van Dien continually stalled and avoided presenting Van Dien for his deposition. The court ordered Van Dien's deposition be taken within a thirty-day period of time. Despite numerous attempts, Gooch refused to set a date or have Van Dien appear for his deposition. Defendants' attorneys in the Van Dien civil lawsuit also issued subpoenas to Waller and Del Re for trial. On February 14, 2002, Gooch voluntarily dismissed Van Dien's civil lawsuit for the second time.

### The "Box Truck"

Sometime prior to December 2000, Hindi and CHARC purchased an Isuzu "box truck" which was modified so that it was outfitted with four video screens. Three of the screens, which were on each side and the rear of the vehicle, were one-hundred-inch diagonal. The screen in front of the truck was sixty-inch diagonal. Above each screen was a liquid display readout, which appeared in red letters. A Sony video "walkman" was also placed in the cabin of the vehicle so the driver could use its monitors to check the video screen functions. The purpose of the truck was to display mobile protest messages. The truck soon became known as the "Tiger Truck" ("Tiger").

12

Prior to April 4, 2002, the Tiger and its purposes were widely publicized throughout Illinois and the United States. Prior to this date, the Tiger traveled widely throughout Illinois and the United States, delivering its protest messages without being cited for any traffic offenses.

Another Rodeo was scheduled in Wauconda for July 2002. In the month prior, Wauconda officials, WCC officials, and Quick were aware of the Tiger and had several conversations concerning how to deal with the Tiger. Quick told selected WCC members and Wauconda officials that he would defend the village from the Tiger. For this purpose, Quick instructed Patrolman John Combs ("Combs") to effect a pretextual stop on April 4, 2002, when Quick had been informed that the Tiger entered the Wauconda jurisdiction.

Pursuant to Quick's direction, Combs stopped Hindi and the Tiger on April 4, 2002. The pretext of the stop was a claim that there had been a report that the Tiger had "almost caused an accident". At the time of the stop, Combs knew that the Tiger was presenting anti-rodeo messages. Combs charged Hindi with two violations of the Illinois Vehicle Code. One violation was for the display of a red light visible from directly in front of the vehicle in violation of 625 ILCS 5/12-212. The second violation was for violation of 625 ILCS 5/12-604, which prohibits the operation of a motor vehicle equipped with television broadcast receiver equipment so located that the viewer or screen is visible from the driver's seat. Combs warned Hindi that if he continued, he would be cited again.

On April 14, 2002, Hindi again entered the boundaries of Wauconda with the Tiger, displaying anti-rodeo messages, and was again ticketed for violating 625 ILCS 5/12-212(c). Sometime thereafter, Quick was given the presidency of the WCC.

On March 12, 2002, Hindi went to trial for the traffic citations. At trial, Hindi's lawyer conceded that Hindi had unintentionally violated 625 ILCS 5.12-212(a) in that Hindi was guilty of having a red light in front of the vehicle. A finding of guilt as to this section was entered against Hindi. On the State's motion, the television receiver charge was dismissed. Additionally, the April 14, 2002 citation was also dismissed.

Wauconda and Quick's Motion to Dismiss

Wauconda and Quick seek to dismiss Count II of the First Amended Complaint and dismiss Wauconda and Quick from the matter. Plaintiffs did not file a timely response to Wauconda and Quick's Motion to Dismiss.

Count II seeks declaratory and injunctive relief against Wauconda and Quick. Plaintiffs seek a declaratory judgment that: (1) the Plaintiffs' rights to the First Amendment include the right to engage in mobile signage for the exercise of their First Amendment rights and that the State of Illinois has not prohibited commercial mobile signs, (2) the use of 625 ILCS 5/12-212(c) to prevent Plaintiffs from using mobile signage from presenting their non-commercial message is unconstitutional and violative of their First Amendment rights, and (3) Defendants and their agents are restrained from acting in any manner to enforce such statute in any manner to interfere with the Plaintiffs' exercise of their First Amendment rights. Plaintiffs also seek to enjoin Defendants from enforcing 625 ILCS 5/12-212 and interfering with the Plaintiffs' proper exercise of their First Amendment rights.

Wauconda and Quick first argue that the Plaintiffs lack standing to bring Count II.

A plaintiff must demonstrate "injury in fact" in order to establish standing in a cause of action. *Vermont Agency of Natural Resources v. United Sates*, 529 U.S. 765, 771 (2000) (*Vermont*).

Injury in fact is harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical". *Vermont*, 529 U.S. at 771 (internal quotations and citation omitted). Injury in fact is more than an injury to a cognizable interest -- it requires that the party seeking relief be itself among the injured. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (*Lujan*).

Here, Plaintiffs have alleged that they were ticketed in April 2002 for violations of the Illinois Vehicle Code ("Code"). These violations have been fully adjudicated in state court. Plaintiffs seek an injunction declaring the pertinent Codes to be unconstitutional and to restrain Defendants from enforcing such Codes. However, Plaintiffs have not alleged they have suffered an injury in fact. Plaintiffs alleged that the Rodeo was taking place in July 2002. There are no allegations that Defendants interfered with Plaintiffs' First Amendment rights during that Rodeo or that any protests even occurred at that July 2002 Rodeo. Nor are there any allegations that they are in actual or imminent harm of having their rights violated in any future Rodeo protests. Based on the allegations of the First Amended Complaint, Plaintiffs have only alleged a conjectural or hypothetical injury. Accordingly, Plaintiffs have failed to sufficiently plead an injury in fact; and they lack standing to bring Count II.

Wauconda and Quick also argue that this Court would lack subject matter jurisdiction over any claims based on the prior tickets pursuant to the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine is derived from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) (*Rooker*) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) (*Feldman*). The doctrine provides that lower federal courts lack subject matter jurisdiction to review state court civil decisions. *See Edwards v. Illinois Bd. of Admissions to the Bar*, 261 F.3d 723, 728 (7th Cir. 2001) (*Edwards*). The doctrine applies to claims that were actually

raised before the state court and claims that are inextricably intertwined with the state court determination. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (*Long*).

In assessing the applicability of the *Rooker-Feldman* doctrine, "the fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment". *Long*, 182 F.3d at 555, quoting *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 701-02 (7th Cir. 1998) (*Centres*). If the alleged injury of the federal plaintiff "is distinct from the state court judgment and not inextricably intertwined with it, the *Rooker-Feldman* doctrine does not apply". *Centres*, 148 F.3d at 702. To determine whether the alleged injury is inextricably intertwined, the court focuses on whether the federal court is being called upon to review the state court decision. *Edwards*, 261 F.3d at 729.

In the instant case, the state court fully adjudicated the tickets that Plaintiffs received that are subject to Count II of the First Amended Complaint. Plaintiffs could have raised the issue of the constitutionality of 625 ILCS 5/12-212 and its application with the First Amendment. Any review of the claims that pertain to the tickets received in April 2002 would require this Court to review the state court decision. Accordingly, this Court would not have subject matter jurisdiction over these claims.

Alternatively, Wauconda and Quick also argue that Count II is barred by *res judicata*.

Because an Illinois court issued the previous judgment, this Court must apply Illinois law to determine whether *res judicata* bars Plaintiffs' claims. *See 4901 Corp. v. Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 2000). In Illinois, *res judicata* bars relitigation of claims that could have been or were asserted in an earlier proceeding. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998) (*River Park*). A claim is precluded if it shares three elements with an earlier action: (1)

an identity of parties or their privies, (2) a final judgment on the merits, and (3) an identity of the causes of action. *River Park*, 184 Ill. 2d at 302.

Here, the Illinois and present case include the same parties. There was also a final judgment on the merits in the Illinois court. Lastly, there is an identity of the cause of action. Both the instant action and the previous Illinois action pertained to the Plaintiffs being cited for violating certain sections of the Code while driving the Tiger to protest alleged mistreatment of animals. In both actions, Plaintiffs could have argued that the sections of the Code that had been applied to them, or may be applied to them in the future, violate their constitutional First Amendment rights. Based on the above, Count II is barred by the doctrine of *res judicata*.

Lastly, as to Count II, Wauconda and Quick argue that Count II fails, as a matter of law, to allege a First Amendment violation.

The Illinois statute at issue restricts the type of lighting that may be on a vehicle. Exceptions include those provided for elsewhere in the Code as well as flashing lights for turn signals and hazard lights. *See* 625 ILCS 5/12-212. The restriction is content-neutral. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A] regulation that serves purposes unrelated to the content of the expression is deemed neutral...")

The government may, "within reasonable bounds and absent censorial purpose", regulate activities which may also constitute forms of expression. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (*Ladue*). Such regulation may be put into place for the state's legitimate interest in promoting the safety of its citizens on public streets. *See Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997); *Ladue*, 512 U.S. at 48.

In the instant case, the statute in question is not directed at speech and is content-neutral. Furthermore, the statute serves the significant governmental interest of ensuring traffic and public safety.

In addition, there are multiple alternative methods of communicating to the public without the need of lights on a vehicle driving on a public street. Accordingly, this statute is content-neutral, is reasonable, and is narrowly tailored to the state's significant interest in traffic and public safety. Therefore, as a matter of law, the statute does not violate the First Amendment.

For the reasons stated above, Wauconda and Quick's Motion to Dismiss is granted. Count II is dismissed with prejudice. Furthermore, Wauconda and Quick are dismissed from the lawsuit as Count II is the only count against Wauconda and Quick.

<u>Gooch and Wysocki's Motion to Dismiss</u>

Gooch and Wysocki first argue that Count I should be dismissed as to them because Plaintiffs have failed to plead that Gooch and Wysocki deprived Plaintiffs of a Constitutional right.

Count I of the First Amended Complaint alleges a conspiracy to retaliate against Plaintiffs for the exercise of their First Amendment Rights. As to Gooch and Wysocki, Plaintiffs allege that Gooch and Wysocki filed, and re-filed, Van Dien's libel suit and presented an extorious settlement agreement as part of the conspiracy to retaliate against the Plaintiffs for the exercise of their First Amendment rights and to eliminate Plaintiffs' ability to effectively protest future Rodeos.

A Section 1983 cause of action requires a plaintiff to plead that he was deprived of a right secured by the Constitution or a federal law at the hands of someone acting under color of law. *See Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000). The First Amendment "prohibits ... retaliating against the exercise of one's First Amendment right of free Speech." *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000) (*Powers*).

Here, Plaintiffs have pled that Gooch and Wysocki conspired with several state actors to retaliate against Plaintiffs for their exercise of the First Amendment rights, *i.e.*, protesting the Rodeos.

Accordingly, Plaintiffs have sufficiently pled that Gooch and Wysocki deprived Plaintiffs of a Constitutional right. *See Powers*, 226 F.3d at 820; *Moreno v. Town of Cicero*, 2002 WL 31017932 at * 2 (N.D. Ill. Sept. 5, 2002).

Gooch and Wysocki also argue that Plaintiffs have not sufficiently pled a conspiracy between Gooch and Wysocki and the state actors.

Plaintiffs need not plead a conspiracy with exact specificity. Rather, circumstantial evidence may provide adequate proof of a conspiracy to defeat a motion to dismiss. *See Moreno v. Town of Cicero*, 2002 WL 31017932 at * 2 (N.D. Ill. Sept. 5, 2002). To adequately plead a conspiracy, plaintiffs need only plead "sufficient acts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally, while those facts documenting the overt acts must be pleaded specifically." *Reddick v. Bloomingdale Police Officers*, 2001 WL 789432 at * 5 (N.D. Ill. July 12, 2001).

The allegations of the First Amended Complaint, as summarized in the foregoing lengthy recitation of facts, adequately plead that Gooch and Wysocki conspired with state actors to retaliate against Plaintiffs for their exercise of their First Amendment rights.

Lastly, Gooch and Wysocki argue that Plaintiffs have failed to adequately plead a state law claim of conspiracy to commit malicious prosecution.

To plead a claim of conspiracy to commit malicious prosecution, a plaintiff must allege a claim for malicious prosecution. *See Cult Awareness Network v. Church of Scientology Inter'n*, 177 Ill. 2d 267 (1997) (*Cult Awareness*). Under Illinois law, the elements of a claim of malicious prosecution are: (1) the defendant sued the plaintiff maliciously and without probable cause, (2) the plaintiff was injured beyond the cost and annoyance of defending the lawsuit, and (3) the lawsuit terminated in the plaintiff's favor. *See Miller v. Rosenberg*, 196 Ill. 2d 50, 58 (2001).

19

In the instant case, Plaintiffs have pled that the Defendants filed and re-filed the libel suit maliciously and without probable cause. In support of their allegations that the suit was filed without probable cause, Plaintiffs include Judge Moran's findings in the Federal civil suit brought by Plaintiffs in the present case. However, Plaintiffs also include in their pleadings the content of the flyer which stated that Van Dien had committed a crime and was unfit to serve in a public office.

Gooch and Wysocki argue that the First Amended Complaint actually pleads that Van Dien had probable cause to file suit because the statements were libel *per se*. In response, Plaintiffs argue that because Van Dien was a public official, Van Dien would have to show that the instant Plaintiffs acted with actual malice or a reckless disregard of the truth pursuant to *New York Times Co. v. Sullivan*.

At this stage of litigation, dismissal based on the issue of probable cause would be premature. The First Amended Complaint, while pleading some facts that support Gooch and Wysocki's probable cause argument, also contains sufficient pleadings in support of Plaintiffs' argument. This factual question cannot be answered at this stage of litigation.

Gooch and Wysocki also argue that Plaintiffs have failed to plead special damages.

The special damages rule is the Illinois courts' "recognition of its responsibility to maintain a proper balance between the societal interest in preventing harassing suits and in permitting the honest assertion of rights in our court rooms." *See Cult Awareness*, 177 Ill. 2d at 277. Special damages for purposes of a malicious prosecution claim do not include losses generally involved in defending a suit, such as loss of income, *Balthazar v. Dowling*, 65 Ill. App. 3d 824 (1978); lost wages, *Petrick v. Kaminski*, 68 Ill. App. 3d 649 (1979); loss of potential tenants, *Equity Assocs. v. Village of Northbrook*, 171 Ill. App. 3d 115 (1988); or lost rental income, *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995). In addition, special damages do not include a voluntary decision not to protest as a result of an alleged wrongfully brought civil suit. *See Thomas v. Hileman*, 333 Ill. App. 3d 132, 139 (2002)

(*Thomas*); *Levin v. King*, 271 Ill. App. 3d 728, 737 (1995) (*Levin*). Instead, the plaintiff must allege more, *i.e.*, that the defendant acted to prohibit a plaintiff's protests. *See Thomas*, 333 Ill. App. 3d at 139; *Levin*, 271Ill. App. 3d at 737.

In the instant case, Plaintiffs seek losses generally involved in defending a civil suit, such as attorney's fees and lost income from fund-raising efforts. Plaintiffs also allege that the libel suit was brought to punish the Plaintiffs for exercising their First Amendment rights. However, the Plaintiffs do not allege that, any time after the suit was filed, they were prevented from exercising their First Amendment rights or that they did not protest because of the pending suit. Therefore, Plaintiffs have not pled special damages as required by Illinois law, and Count III must be dismissed without prejudice. *See Thomas*, 333 Ill. App. 3d at 139; *Levin*, 271Ill. App. 3d at 737.

### Van Cien's Motion to Dismiss

Van Dien argues that the existence of probable cause for Van Dien's libel lawsuit is fatal to Plaintiffs' First Amendment retaliation claim. However, as stated above, the factual question of probable cause is not properly addressed at this stage of litigation. Accordingly, the First Amendment retaliation claim is not dismissed.

Lastly, Van Dien argues that Plaintiffs have failed to adequately plead a state law claim of conspiracy to commit malicious prosecution. Van Dien's argument essentially mirrors Gooch and Wysocki's argument as to the malicious prosecution claim. As fully set forth above, Plaintiffs have failed to sufficiently plead special damages. Accordingly, Count III is dismissed.

For the reasons stated above, Wauconda and Quick's Motion to Dismiss is granted. Count II of Plaintiffs' First Amended Complaint is dismissed with prejudice. Gooch and Wysocki's Motion to

Dismiss and Van Dien's Motion to Dismiss are granted in part and denied in part. Count III of Plaintiffs' First Amended Complaint is dismissed without prejudice.

Dated: *March 19, 2003*

JOHN W. DARRAH
United States District Judge